Susan M. MAXWELL, Plaintiff,

v.

**J. BAKER, INC., and Prange Way, Inc., Defendants.**

Civ. No. 4-90-941.

United States District Court, D. Minnesota, Fourth Division.

Feb. 22, 1995.

---

Earl D. Reiland, Daniel W. McDonald, Matthew Joseph Goggin, Alan Gerard Gorman, Merchant, Gould, Smith, Edell, Welter & Schmidt, P.A., Minneapolis, MN, James J. Foster, Wolf Greenfield & Sacks, Boston, MA, for plaintiff.

G. Marc Whitehead, Bruce Howard Little, Popham Haik Schnobrich & Kaufman, Minneapolis, MN, James J. Foster, Philip G. Koenig, Douglas R. Wolf, Wolf Greenfield & Sacks, Boston, MA, for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on the motion of defendant J. Baker, Inc. ("J. Baker") for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. Based on a review of the file, record and proceedings herein, and for the reasons stated below, the court denies defendants' motion.

## BACKGROUND

This case concerns various systems used to connect shoes which do not have laceholes, buckles or other apertures through which a filament can be threaded to join the shoes. Before 1983, discount stores connected shoes without apertures by punching holes in each shoe and passing a filament through the holes. The method was not ideal, however, because it left a permanent blemish on the shoes.

Maxwell is the owner of record and named inventor of United States Patent No. 4,624,-060 ("'060 patent" or "Maxwell patent"). The patent claims a "system for connecting mated pairs of shoes to prevent separation and possible mismatching when offered for sale in self-service stores." Maxwell patent, abstract. Maxwell filed an application for a patent on October 6, 1983, and a patent was issued on November 25, 1986.

The '060 patent describes a system that threads a filament through loops or fastening tabs secured between the inner and outer soles of each shoe of a mated pair. Maxwell's shoe connection system securely joins shoes together without damaging them. The loops used to attach the shoes are not visible when the shoes are worn and do not irritate the wearer. In 1985, Maxwell granted Target Stores a non-exclusive license to use the attachment system on shoes purchased for resale. Once Target began using Maxwell's shoe connection system other discount retailers, including J. Baker, followed suit. J. Baker sells shoes through leased footwear departments in large discount retail stores. In 1990, Maxwell tried but failed to negotiate a license with J. Baker. J. Baker then developed and currently uses alternative shoe connection systems which secure the loop or fastening tab in a different location within the shoe.

Maxwell filed suit alleging that J. Baker and Prange Way, Inc. sold shoes using attachment systems that infringed the '060 patent. Defendants argued that they successfully designed around the '060 patent and asserted that their current shoe connection systems do not infringe Maxwell's patent. Defendants also asserted that Maxwell was not the original inventor of the claimed in-

vention. A month long jury trial was held in October and November 1993. At the close of evidence, defendants moved for judgment as a matter of law on all claims. The court granted the motion as to Prange Way, Inc. but declined to rule at that time as to J. Baker.

The case against J. Baker was submitted to the jury and, on November 10, 1993, a special verdict was returned in favor of Maxwell. The jury upheld the validity of the '060 patent. The jury found that all of the shoe connection systems used by J. Baker infringed the claims of the '060 patent. The jury also found that Maxwell complied with the marking statute, 35 U.S.C. § 287(a), in November 1987 and that she gave J. Baker actual notice of the infringement on June 14, 1990. The infringement by J. Baker after 1990—when it had actual notice of the patent—was found to be willful. The jury determined that $.05 was a reasonable royalty rate per pair of shoes and that J. Baker had sold 31,000,000 shoes using the patented invention between November 1987 and August 1993. The jury also found that the damages suffered by Maxwell as a result of J. Baker's infringement exceeded the five cent royalty and awarded additional compensatory damages of $1,500,000. Finally, the jury rejected J. Baker's laches defense and found that it was not materially prejudiced by delay on the part of Maxwell in bringing suit.

Defendant J. Baker moves for judgment under Rule 50(b) asserting the court erred in not holding as a matter of law that the '060 patent was invalid based on prior inventorship and that the shoe connection systems used by J. Baker since 1990 do not infringe the '060 patent either literally or by equivalency. J. Baker also contends that the jury's finding of willfulness is not supported by clear and convincing evidence. J. Baker argues that the marking date fixed by the jury is not supported by substantial evidence and that there is no evidence to support the award of $1,500,000 in excess of the reasonable royalty awarded. J. Baker challenges the evidentiary basis for the royalty rate set by the jury as well as for damages associated with particular types of shoes. J. Baker also

asserts that the doctrine of laches bars Maxwell's recovery of damages before J. Baker had actual notice of the infringement on June 14, 1990.

The '060 patent describes a pair of shoes, "each of which has a fastening tab firmly secured thereto and with a hole at one end or with a loop formed by doubling of the tab, and a filamentary fastening element extending through the holes or loops of each of the fastening tabs, the ends of the filamentary element being joined together in a closed loop." Maxwell patent, col. 1, lines 49–55. The fastener tab is "secured by means of strong adhesive, stitching, staples, or all three, to the bottom sole of the shoe and the inner sole applied on top of the adhered portion of the fastening tab." Maxwell patent, abstract.

The '060 patent asserts two independent claims, claims 1 and 3.[1] Maxwell's claims of infringement focused on claim 3, which embodies the following limitations:

3. A system for attaching together mated pairs of shoes, which comprises in combination:

(A) A pair of shoes, each of which has an inner sole and an outer sole, said inner sole having a side edge, each shoe also having a shoe upper with an inside surface and a top edge, each of said shoes further having a fastening tab and means for securing said tab between said inner and outer soles,

(1) said fastening tab being an integral sheet with two parts,

(2) the first of said parts extending horizontally between the outer sole and the inner sole of the shoe and being firmly secured thereto with said securing means,

(3) the second of said parts comprising the opposite end of the tab extending from the first of said parts at the side edge of the inner sole upwardly along the inside surface of the shoe upper and extending so that said opposite end remains beneath the top edge of said shoe upper,

---

1. Claim 2 is dependent upon claim 1; claim 4 of the patent depends upon claim 3.

(4) the second of said parts having an aperture adjacent to its outermost end

(B) a fastening element extending through the apertures of each of said fastening tabs, the ends of the element being joined together in a closed loop; whereby said pair of shoes is attached together by said fastening element passing through the aperture in each of said tabs so that on removal of said fastening element, said shoes separate and said tabs are not visible outside said shoe uppers.

Maxwell patent, col. 4, lines 15–44.

Claim 1 contains essentially the same limitations as to location as claim 3, but describes the use of a tab folded over to form a loop as an aperture instead of a tab with a hole at one end. Maxwell patent, col. 3, lines 22–47 and col. 4, lines 1–9. Claim 1 describes the first part of the fastening tab as "one end of the elongated tab extending horizontally between the inside surfaces of the outer sole and inner sole of the shoe and firmly secured thereto with said securing means." Maxwell patent, col. 3, lines 33–37. The opposite end of the "elongated tab" extends "from one edge of the inner sole and vertically upward along but spaced from the inside surface of the shoe upper and extending so that said opposite end remains beneath the top edge of said shoe upper." *Id.* at lines 39–44. The second part of the tab has an aperture "in the form of a loop formed by doubling the fastening tab over on itself." *Id.* at lines 45–47.

The accused devices are several types of shoe connection systems used by J. Baker. The jury found that each shoe connection system infringed the '060 patent. From 1985 to 1990, J. Baker ordered pairs of shoes connected together with a filament passed through loops "under the sock." In response, vendors provided shoes with loops secured between the inner and outer soles as well as shoes with loops secured between the sock lining and the inner sole. In 1990, J. Baker adopted alternative shoe connection systems which secure the loop or fastening tab in a different location within the shoe.

For shoes that do not have a suitable aperture but do have a counter pocket, J. Baker uses a shoe connecting system in which a loop or fastening tab is sewn to the counter pocket of the shoe. A counter pocket is a stiff structure that provides support for the heel of the shoe and extends vertically on the inside of the shoe upper to the top line in a semicircle around the heel area. One end of the tab is stitched under the vertical seam of the counter pocket lining at a point midway between the insole and the top line near the rear of the shoe upper. The other end of the tab extends horizontally toward the front of the shoe and forms a loop. The loops are connected by a filament and are not visible outside the shoes when the shoes are worn.

J. Baker employs a slightly different shoe connection system for shoes that have neither an aperture or counter pocket. The loops are attached inside the shoe upper at the top line of the shoes. The loops are connected by a filament threaded through the loops. The top line system may be used for lined or for unlined shoes. The loops are generally not visible outside the shoes when worn. The same system is used in boots except that the loop is secured two inches below the top line on the vertical seam.

## DISCUSSION

■ J. Baker as a proponent of a motion for judgment as a matter of law confronts a difficult standard. To succeed on its motion, J. Baker must show (1) that the jury's findings are not supported by substantial evidence or (2) that the facts properly found cannot support the jury's verdict. *Mentor Corp. v. Coloplast, Inc.,* 998 F.2d 992, 994 (Fed.Cir.1993). A finding is supported by substantial evidence if a reasonable juror could have made that finding upon considering the record as a whole. *Wang Lab., Inc. v. Toshiba Corp.,* 993 F.2d 858, 863 (Fed.Cir. 1993). The court views the evidence in the light most favorable to Maxwell, assumes that the jury resolved all conflicts in favor of Maxwell, assumes as true all facts which Maxwell's evidence tended to prove and gives Maxwell all favorable inferences which may reasonably be drawn from proved facts. *Dana Corp. v. IPC Ltd. Partnership,* 860 F.2d 415, 417 (Fed.Cir.1988). It is irrelevant

that the evidence could also support a contrary verdict, when a reasonable jury could have reached the verdict that was reached in this case. The court is not free to set aside a verdict merely because it would have ruled differently, or believes that the jury should have drawn different inferences and conclusions. Rather, the jury's verdict must be upheld if supported by substantial evidence.

### 1. Patent Validity

■ In reviewing a verdict concerning patent validity, the court presumes the jury made the proper findings to support its verdict. *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 619 (Fed.Cir. 1985). The burden of proving patent invalidity by clear and convincing evidence rests on J. Baker. J. Baker offered testimony which suggested that the shoe connection system claimed in the patent may have been invented by another. Maxwell presented evidence to the contrary. The jury expressly confirmed the validity of the '060 patent. The court concludes that there was substantial evidence to support the jury's finding that invalidity based on prior inventorship had not been proved by J. Baker.

### 2. Infringement

Maxwell's claims of infringement were submitted to the jury under two theories, literal infringement and infringement under the doctrine of equivalents. The jury found that all of the shoe connection systems used by J. Baker infringed the claims at issue. It is not possible to determine from the interrogatories, however, whether the jury found literal infringement or infringement by equivalency. Accordingly, the court considers both theories to determine if the jury's verdict is sustainable.

### A. Literal Infringement

■ Literal infringement requires that every limitation of a patent claim be found in the alleged infringing product. *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044,

1054 (Fed.Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). For literal infringement to exist, the properly interpreted claims of the '060 patent must describe the accused device. *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934–35 (Fed.Cir.1987) (en banc), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). A literal infringement analysis involves two steps: interpretation of the patent's claims and comparing the accused devices to the claims as interpreted.

■ Claim interpretation remains a question of law to be decided by the court on a motion for judgment as a matter of law. *Senmed, Inc. v. Richard–Allan Medical Indus. Inc.,* 888 F.2d 815, 818 (Fed.Cir.1989).[2] To determine the intended meaning of a claim, the court looks to the claim language in context of the specification, the prior art and the prosecution history. *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1118 (Fed.Cir.1985) (en banc). Terms in a claim are to be given their ordinary and accustomed meaning unless it appears the inventor used them differently. *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387 (Fed.Cir.1992).

■ Presuming the jury found literal infringement, J. Baker contends that such a finding was necessarily made in relation to a claim interpretation that cannot be sustained. Maxwell argued the term "fastening tab" as used in the patent claims does not merely designate a tab separate from the shoe but also encompasses shoe parts. The evidence at trial focused on the element in claim 3 that requires a part of the "fastening tab" extend "horizontally between the outer sole and the inner sole of the shoe and [be] firmly secured thereto" and the element in claim 1 that requires the first part of the "fastening tab" extend "horizontally between the inside surfaces of the outer sole and inner sole of the shoe and [be] firmly secured thereto."

Maxwell's patent expert, Malcolm Moore, opined that the loop and the counter pocket

---

**2.** *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 822–23 (Fed.Cir.1992) ("Where the court's interpretation [of the claims] is not set forth in its instructions [of the claims] to the jury, the court must perform its role of deciding this issue in ruling on the [judgment as a matter of law] motion.") (citation and footnote omitted).

or lining together perform like the "tab" described in the patent claims. Relying on the reference in the claims to the fastening tab as an "integral sheet," Moore stated that the counter pocket and shoe lining are properly considered part of the fastening tab. Moore opined that the loop, combined with the portion of the counter pocket or upper lining which is stitched to the loop and extends between the soles of the shoes, provides a "tab" within the literal meaning of claims 1 and 3. Because the counter pocket or lining to which the loop is attached extend horizontally to the bottom of the shoe and are secured between the inner and outer soles, Moore concluded that the accused systems include "fastening tabs" secured where claims 1 and 3 literally require.

The claim language, specification and prosecution history all belie Maxwell's claim interpretation. Maxwell's interpretation differs from the ordinary meaning of "tab."[3] The fastening tab, both as described in the claims and depicted in the drawings, is an item separate from the counter pocket, the lining or the upper of the shoe. There is nothing in the patent language to indicate that the term "tab" is used in an uncommon way. Nor does the patent language indicate that "fastening tab" includes other shoe parts.

The specification of the '060 patent does not indicate that Maxwell intended the term "tab" to have another meaning. In fact, the opposite is true. The statement in the specification that the patented system "comprises in combination a pair of shoes, each of which has a fastening tab firmly secured thereto" indicates that the tab is a separate item and does not encompass shoe parts. Maxwell patent, col. 1, lines 49–50. The specification also states that "[e]ach fastening tab is formed from elongated narrow strong sheet material, such as synthetic resinous plastic material and each fastening tab has two parts." *Id.* col. 1, lines 55–58.

The specification notes that, "[although shown as rectangular, the tab may obviously have rounded ends or may be in the form of an elongated oval, or the like." *Id.* col. 3, lines 10–12. Moreover, the statement that the second part of the tab "extends upwardly along the inside surface of the upper body of the shoe, but spaced therefrom," demonstrates that the tab is an item different from the lining or upper. *Id.* col. 1, lines 64–66. The statement that "the tabs may be stitched into a lining seam of the shoes at the sides or back of the shoes," also indicates that neither the lining, the upper nor the counter pocket are part of the fastening tab itself. *Id.* col. 2, lines 41–43.[4]

The use of the term "tab" in the prosecution history also undermines Maxwell's interpretation. *See* Maxwell's Amendment under Rule 111 filed February 4, 1985 ("Claim 1 requires a tab on the inside of the shoe upper as opposed to [an] outside tab"); *Id.* ("once the fastening element is cut from the shoes, there is no disfiguring remainder. The shoes are ready to be worn. The tabs simply rest along the inside surface of the shoe upper."); Maxwell's Amendment under Rule 111 filed May 8, 1985 ("the present invention as defined by claim 1 wherein the ends of a piece of material are held under the insole and a

---

**3.** The dictionary may be consulted to establish the "ordinary" meaning of a disputed term. *Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 951 & n. 8 (Fed.Cir.1993). *See Webster's II New Riverside University Dictionary* (1984) (defining "tab" as "a projection, flap, or short strip attached to an object to facilitate opening, handling or identification."); *Random House Dictionary of the English Language* (1969) (defining "tab" as "a small flap, strap, loop, or similar appendage, as on a garment, used for pulling, hanging, decoration, etc.").

**4.** *See also* Maxwell patent, col. 1, lines 59 & 62–63 ("one end of the elongated tab ... the opposite end of the elongated tab"); *Id.* col 1., line 68 and col. 2, line 1 ("loops caused by doubling the

tabs"); *Id.* col. 2, lines 21–26 ("At the time of manufacture, each shoe is provided with a fastening tab ... [the tab] is thin flat and elongated formed from strong sheet material, such as plastic impregnated cloth, polyester film such as Mylar, or similar strong material which is resistant to tearing."); *Id.* col. 3, lines 5–7 ("typically the fastening tab may be between about ¼ to ¾ inch in width and 1½ to 3 inches in length"); *Id.* col. 3, lines 8–10 ("Approximately one-half of the length of the tab should be secured between the inner and outer soles."); *Id.* abstract ("The tab comprises a length of narrow strong sheet material having a hole or loop at one end for receiving a fastening filament.").

loop projects upwardly along the interior sidewall of the shoe.").

If Maxwell wished or intended to use the term "tab" in some particular way other than that understood by one of ordinary skill in the art at the time the patent application was filed, she must have defined it in the patent prior to issuance. This she did not do. Nothing in the patent or the specification would have put one of ordinary skill in the art on notice that the term "tab" meant other than what it says. Thus, the term "tab" must be given its ordinary meaning. Accordingly, other parts of the shoe—including the counter pocket, the shoe upper, the upper lining and the sock lining—cannot be considered part of the "fastening tab" described in the '060 patent.

■■■ Maxwell's argument that the counter pocket and top line systems literally infringed the '060 patent turned on her claim interpretation. Having rejected Maxwell's interpretation, the court also concludes that the claims as properly construed are not literally infringed by the counter pocket and top line systems and that no reasonable jury could so find. The patent claims require that a part of the "fastening tab" extend horizontally between the inner and outer soles of the shoe and be firmly secured thereto. The tabs in the counter pocket and top line systems are secured in a different location within the shoe. There is no literal infringement as the tabs in those systems are not secured between the inner and outer soles of the shoe as required by claims 1 and 3 properly construed.

■■■ There is substantial evidence to support a finding of literal infringement based on J. Baker's use of a shoe connection system identical to the one described in the patent. Between 1985 and 1990, J. Baker ordered pairs of shoes connected together with a filament passed through loops "under the sock." The evidence, taken in favor of Maxwell, showed that in response the vendors provided J. Baker shoes with loops secured between the inner and outer soles rather than with loops secured between the sock lining and the inner sole. The court concludes that a reasonable jury could find that the "under the sock" system in practice was

identical to the patented system. Accordingly, the jury's finding of literal infringement based on shoe connection systems used by J. Baker, other than the counter pocket and top line systems, is supported by substantial evidence.

## B. Infringement under the Doctrine of Equivalents

■■■ There is no reason to conclude that the jury arrived at Maxwell's claim interpretation. The jury's verdict is readily understood as pertaining to infringement by equivalency which does not require adoption of Maxwell's claim interpretation. The doctrine of equivalents recognizes that a patented invention may be infringed not only by a device precisely described in a patent claim, but also by a device that falls outside the literal claims but is substantially the same thing, used in substantially the same way, to achieve substantially the same result. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

■■■ The question is not whether the accused systems are equivalent to the patented invention. Rather, the proper focus is whether the accused systems contain an equivalent to the tab in the patented system which is secured between the inner and outer soles of the shoes. Maxwell has the burden of showing that the required limitation was met equivalently in each of the accused systems. A "substantial equivalent" of a limitation is one that fails to "substantially change the way in which the function of the claimed invention is performed." *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 (Fed.Cir.1987). There was no dispute concerning the function or result prongs of the test. J. Baker conceded that the accused systems perform substantially the same function and achieve the same result as the patented shoe connection system. That is, the accused systems connect mated pairs of shoes together in a secure manner without damaging the appearance of the shoes. The contested issue was whether the accused systems perform that function and

achieve that result in substantially the same way as the patented system.

■■■■ The doctrine of equivalents is based on substantial, not exact, identity of ways. The way devices work is a question of fact, as is the question of whether the ways are equivalent. The significance of the similarities and differences between the way the accused and patented systems work presented a factual issue for the jury. The substantially the same way test may be met if an equivalent of a recited limitation has been substituted in the accused device. *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1325–26 (Fed.Cir.1991). The tabs in the accused systems are secured on the inside of the shoe upper and remain beneath the top edge of the upper after the filament is cut. The jury found that the accused systems perform the same function as the patented invention in substantially the same way. The jury's factual finding of infringement under the doctrine of equivalents must be sustained unless J. Baker demonstrates that no reasonable juror could have reached such a result.

Maxwell presented expert testimony comparing the claims of the '060 patent to the accused devices. The jury heard evidence that varying the placement of the tabs in the accused systems did not change the way those systems worked as compared to the patented invention. Moore opined that stitching the loop to the shoe lining, upper or counter pocket, which are secured between the inner and outer soles, was an insubstantial change from the invention claimed in the patent. J. Baker attempted to show that the way the accused shoe connection systems obtain the result differed substantially from Maxwell's patented system. The jury, however, chose to accept the evidence supporting equivalency and infringement.

The court must sustain the jury's verdict if there is any reasonable basis for it. Considering all the inferences in favor of Maxwell, the evidence established that the accused systems are merely an insubstantially altered form of the invention set forth in the patent claims. Although the accused systems technically escape the claim language, the jury could have reasonably found that each system contains an equivalent for the claim limitation that is not met literally. There is also substantial evidence to support the jury's implicit determination that the tabs in the accused systems, although placed at the side or back of the shoe uppers, operate in a mode similar, if not identical, to the patented system. In sum, a reasonable jury could have found that there are no substantial differences in how the shoe connection systems work. The court concludes that the jury's finding of infringement by equivalency is supported by substantial evidence.

It is well established that equivalency is a question of fact for the jury. *See Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 986 (Fed.Cir.1989) (equivalency of claim limitations and accused structure and infringement are question of facts), *overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir.1992); *Pennwalt*, 833 F.2d at 936 (same). J. Baker insists that because the doctrine of equivalents is designed to do equity, infringement under the doctrine is a question for the court not a factual determination within the province of the jury.[5] The court views its role differently. When considering the doctrine of equivalents, the court performs its traditional function as a gate keeper. That is, the court must first be satisfied that the facts in a particular case justify application of the doctrine before allowing the jury to consider infringement by equivalency. Once the court determines that the threshold has been met, as it did here, the issues of equivalency and infringement are for the jury to decide.

■■■■ J. Baker argues here, as it did to the jury, that infringement by equivalency cannot lie because it successfully "designed around" the system claimed in Maxwell's patent. Although designing or inventing around patents to make new inventions is encouraged, piracy is not. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed.Cir. 1991) (citing *Graver Tank*, 339 U.S. at 609–10, 70 S.Ct. at 930). Thus, where an infring-

5. The court notes that the respective roles of the court and jury in applying the doctrine of equivalents is currently being contemplated by the Federal Circuit. *Hilton Davis Chemical Co. v. Warner–Jenkinson Co., Inc.*, No. 93–1088 (Fed.Cir.) (en banc).

er merely makes an insubstantial change, essentially misappropriating the patented invention, infringement by equivalence may lie. The evidence, taken in favor of Maxwell, established that J. Baker deliberately adopted only minimal changes while maintaining the same function as the patented system. At the time J. Baker devised the accused systems it knew of the '060 patent and had been charged with infringement. Although J. Baker maintained that it had carefully designed around the patent claims, the jury heard evidence that the decision to move the loops to the counter pocket and top line was reached in a matter of moments without examining the patent language or consulting counsel.[6] The court concludes that a reasonable jury could find that J. Baker had no intent to innovate, made no attempt to design around the patent and impermissibly copied and misappropriated the essence of the patented invention.

J. Baker also argues that infringement under the doctrine of equivalents is precluded because the range of equivalents that includes its shoe attachment systems also covers the prior art disclosed in the Ornsteen, Nelson and Moore patents.[7] Maxwell cannot, of course, use the doctrine of equivalents to extend the right to exclude others so broadly as to ensnare devices within the public domain. *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 683–84 (Fed.Cir.1990). There was considerable testimony concerning whether the range of equivalents asserted by Maxwell encompassed structures already in the prior art. Maxwell's patent expert distinguished the prior art disclosed in the patents relied on by J. Baker. Maxwell also offered evidence that the novelty or importance of her system was the concept of a tab inside a shoe which includes an aperture through which a filament may be passed to attach a mated pair together and which neither disfigures the shoes when the filament has been cut nor results in discomfort to the wearer.

J. Baker's argument relies heavily on the Nelson patent.[8] J. Baker contends that the Nelson system is identical to the top line system in that a tab is sewn into the inside surface of the footwear for the purpose of connecting mated pairs. The Nelson patent describes a long flexible strip permanently

6. Richard Volpe was charged with deciding where to place the loops in the alternative shoe connection systems. The jury heard the following testimony regarding the placement of the loops in the counter pocket and top line systems:

Q: In what way were you involved with that implementation effort?
A: I basically made the decision to put it in the counter pocket and on the top line.

\* \* \* \* \* \*

Q: How did you come up with that idea?
A: I just thought of it. It wasn't too difficult. You could put it in a lot of different ways.
Q: And when did you come up with that idea?
A: As soon as I heard that we were going to be—that we should stop using this, so I came up with that. It took me about five minutes.
Q: Before the time you came up with the idea of putting the loop into the counter, had you seen Sue Maxwell's patent?
A: I didn't know whether or not she had a patent.
Q: You didn't even know that a patent existed at that point?
A: I had no idea.
Q: What was your understanding as to why you were looking for a different place for the loop?
A: There might be a potential problem with that particular procedure, so I tried to use another procedure.

7. The Ornsteen patent (No. 3,482,335) describes a shoe connection system which uses elongated tabs to join mated pairs of shoes displayed at discount retail stores. One end of each tab is attached to the outside of the shoe, either between the sole and the shoe upper, between the heel and the shoe upper or on the bottom of the shoe. The opposite end of each tab is equipped with a snap fastener. The Nelson patent (No. 1,300,998) discloses a fastening means to prevent separation of rubbers, overshoes or other foot coverings. A long flexible strip is permanently attached to the upper interior side of each rubber. The free ends of the strips have fastening means, consisting of a button and button-hole, a hook and an eye or a buckle, which can be engaged and detached. The Moore patent (No. 1,189,989) describes an attachment for overshoes which allows the wearer to pull the overshoe over the heel of a shoe or boot. A horseshoe shaped loop is permanently attached to the center of the overshoe between the lining and the sole. The wearer places the toe of the shoe or boot into the overshoe and grasps the loop to pull the overshoe over the heel. The loop lies within the overshoe under the boot or shoe.

8. The court notes that Maxwell did not need to distinguish the device described in the Nelson patent during the prosecution history.

attached to the upper inner side of an overshoe or other foot covering. The free end of the strip has means such as buckles or buttons for attaching a pair of overshoes together. In contrast to the accused systems, the Nelson system does not include a filament extending between the tabs. In addition, the strip in the Nelson system does not lay comfortably alongside the inner wall of the footwear. Moore testified that the differences between the Nelson system and the accused systems are great enough to afford Maxwell's patent a range of equivalents which covers the accused systems without also encompassing the Nelson prior art.

J. Baker focuses on its own evidence while disregarding the evidence which supports a finding of equivalency. The evidence, supporting the jury's finding, however, is substantial. After being instructed that the '060 patent claims could not be extended by equivalents to cover devices in the prior art, the jury found that the range of equivalents included the accused systems but did not encompass devices disclosed by the prior art. The court holds that a reasonable jury could find infringement by equivalency between the patented invention and the accused systems used by J. Baker without treading on the prior art.

Finally, J. Baker contends that Maxwell is estopped from asserting coverage of the accused systems. J. Baker argues that the prosecution history of the '060 patent limits the invention to a range of equivalents insufficient to encompass the accused systems. Prosecution history estoppel bars a patentee from enforcing its claims against equivalent structures if those structures were excluded by claim limitations added in order to avoid the prior art. *Wang Lab., Inc. v. Toshiba Corp.*, 993 F.2d 858, 866 (Fed.Cir. 1993). Prosecution history estoppel may also be based on arguments submitted by the patentee to obtain a patent. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362 (Fed.Cir.1983). J. Baker asserts that varying the location of the tab cannot be regarded as an insubstantial change because Maxwell stressed the importance of the location of the tab in her shoe connection system to differentiate the prior art and obtain her patent. Maxwell responds that she did not give up the right to assert that her patent covered by equivalents the counter pocket and top line systems.

The patent examiner initially rejected claims 1 and 2 as obvious in light of the Ornsteen patent. In response, Maxwell stated that the claimed invention "requires a tab on the inside of the shoe upper as opposed to the outside tab of Ornsteen." Maxwell explained that locating the tab inside the shoe is important as the tab in the Ornsteen system must be cut from a shoe before it would be usable and, even after removal, part of the tab would remain visible outside the shoe. In the claimed invention, however, once the fastening element is cut there is no disfiguring remainder and the shoes are ready to be worn. The tabs simply rest inside the shoe beneath the top edge of the shoe upper. Thus, it was the location of the tab inside the shoe upper that was relied upon by Maxwell to distinguish the Ornsteen prior art.

Upon reconsideration, the patent examiner allowed claims 1 and 2 but rejected claims 3 and 4 as unpatentable over Ornsteen in light of the Moore patent. The patent examiner stated that "Moore teaches the use of fastening tab means mounted between an inside surface of an outer sole and inner sole of a shoe and extending outwardly inside the shoe and remains below the top edge of the shoe upper." In rejecting the claims, the patent examiner suggested that the tab of Ornsteen could be used in the manner taught by Moore. Maxwell relied on the placement of the tab along the side of the shoe upper as opposed to the center of the insole to distinguish the Moore prior art. Maxwell explained that "the method of Moore is unacceptable since lumps cannot be avoided at the location of the slots where the tab goes between the inner sole and a lower sole." Maxwell also stated that "the tab of Ornsteen being substituted for the loop of Moore would result in the same problem." In addition, Maxwell noted that the tab of Moore must be cut from the shoes before they could be worn.

The essence of prosecution history estoppel is that a patentee should not be able to obtain, through litigation, coverage of sub-

ject matter relinquished during prosecution. In determining whether prosecution history applies because of a change in the claim language during prosecution, "the court must consider not only what was changed, but the *reason* for such change." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 882 (Fed.Cir.1991) (citation omitted). Maxwell emphasized that part of the novelty of her invention was the placement of the tab inside the shoe along the side of the shoe upper. The tabs in the accused systems are also located inside the shoe along the side of the shoe upper.

The doctrine of prosecution history estoppel was described to the jury and the jury was specifically told that Maxwell could not recapture what she had yielded in order to obtain the patent. The jury found that Maxwell was not estopped from asserting her patent covers by equivalents the counter pocket and top line systems. The court holds that the jury's finding is supported by substantial evidence and comports with the doctrine of prosecution history estoppel. Accordingly, there is no basis to disturb the jury's verdict of infringement under the doctrine of equivalents.

### 3. Willful Infringement

The jury found that J. Baker's infringement after 1990 was willful. Willful infringement is determined from the totality of the circumstances and must be proven by clear and convincing evidence. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1580 (Fed.Cir.1986). In finding J. Baker's infringement was willful, the jury was required to find that J. Baker acted in disregard of the '060 patent and lacked a reasonable basis for believing it had a right to act as it did. *American Medical Sys., Inc. v. Medical Eng'g Corp.,* 6 F.3d 1523, 1530 (Fed.Cir.1993). The existence of willful infringement is a finding of fact which must be sustained unless J. Baker demonstrates that no reasonable juror could have reached such a result. *Id.*

The court rejects J. Baker's argument that the jury's finding of willfulness is ambiguous. J. Baker contends that the jury's finding of willfulness may be based on its use of some shoe connection systems and not others. The court disagrees. The jury found that although the shoe connection systems used by J. Baker between 1986 and 1990 infringed the '060 patent, such infringement was not willful. The jury also found that Maxwell gave J. Baker actual notice of the infringement on June 14, 1990, and that J. Baker's infringement after 1990 was willful. The commencement of J. Baker's willful infringement corresponds with its actual notice of the infringement. The jury's finding of willfulness is properly interpreted as turning on J. Baker's actual notice rather than on the particular type of shoe connection system employed.

J. Baker argues, as it did to the jury, that it did not knowingly copy Maxwell's patented invention. J. Baker maintains that it carefully designed the counter pocket and top line systems to avoid infringing the '060 patent and that it believed in good faith that those systems did not infringe the patent claims. J. Baker offered scant evidence of good faith efforts to design around the claims of the '060 patent. In fact, as noted above, J. Baker's contentions were belied by evidence that it made a snap decision to move the location of the loops without even examining the patent language. It was well within the jury's province to find that J. Baker intentionally disregarded Maxwell's patent rights by deliberately copying the idea and design of her patented invention. The court also holds that a reasonable jury could have deemed the evidence sufficient to establish J. Baker's complete disregard of Maxwell's patent rights.

Moreover, there was no evidence that J. Baker consulted counsel on the question of infringement before adopting the counter pocket and top line systems. While the failure to seek the opinion of counsel does not compel a finding of willfulness, it is a factor which the jury could reasonably rely upon in considering whether J. Baker's infringement was willful. "It is well settled that a potential infringer having actual notice of another's patent rights has an affirmative duty of due care. That affirmative duty will normally entail the obtaining of competent legal advice before engaging in any potentially infringing

activity or continuing such activity." *Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 181 (Fed.Cir.1994) (quotation omitted). J. Baker relied on its assertions and presented no probative evidence of a good faith belief in non-infringement. The jury rejected J. Baker's argument that it had exercised due care and accepted the evidence indicating that J. Baker proceeded without a reasonable basis for believing it had a right to act as it did. The court holds that the combination of facts before the jury provided substantial support for its finding of willful infringement by clear and convincing evidence.

**4. Compliance with the Marking Statute**

 J. Baker maintains that the November 1987 marking date fixed by the jury is not supported by substantial evidence. Maxwell is entitled to damages from the time when she either began marking the patented fasteners in compliance with 35 U.S.C. § 287(a) or when she actually notified J. Baker of its infringement, whichever is earlier. *American Medical Sys.*, 6 F.3d at 1537. If there is a delay between issuance of the patent and compliance with the marking statute, as there was here, the marking once begun "must be substantially consistent and continuous in order for the [patentee] to avail itself of the constructive notice provisions of the statute." *Id.* J. Baker argues that more than a *de minimis* number of shoes were sold by Target without the requisite marking and, consequently, that Maxwell's damages should be limited to the period after J. Baker had actual notice of the infringement.

 Before the patent issued, Target agreed to properly mark patent pending on all shoes and boots attached with the fasteners. The ticketing instructions to Target's vendors were amended to include directions on proper marking. The '060 patent was issued on November 25, 1986. In December 1986, Maxwell notified Target to mark the patent number on all shoes attached with the patented fasteners as required by the license agreement. On May 3, 1987, Maxwell confirmed that Target was completing the effort to change over marking from patent pending to the patent number by October 1987 for

shoes and November 1987 for boots. Long before October 1987, vendors were notified by Target and Maxwell of the need to make these changes. There was testimony that Target used its best efforts to ensure that shoes connected with a loop system were marked with the patent number. There also was evidence that Target's compliance with the marking requirement was greater than 95 percent.

The jury was charged with determining when, if ever, Maxwell, or Target Stores as her licensee, was in full compliance with the marking statute. In accordance with the decision of the Federal Circuit in *American Medical Systems*, the jury was instructed that:

> Maxwell may give constructive notice of her patent by marking the patent number on substantially all shoes sold with the patented fasteners under her authority. Substantially all means that all but a few of the patented articles sold by Maxwell or her licensee were marked with the patent number.

Jury Inst. No. 43. The jury was told that Maxwell had the burden of proving the date on which she or Target as her licensee was in compliance with the marking statute. The jury was also instructed:

> To comply with the marking statute, Maxwell or Target must mark substantially all the shoes with the patent number. A delay between the issuance of the patent and compliance with the statutory marking requirement does not prevent recovery of damages after the date that Maxwell or Target began marking the patented articles in compliance with the statute as long as the marking was consistent and continuous.

> Marking alone is not sufficient to satisfy the marking statute if unmarked products were sold or distributed after marking began. If you should find that Maxwell or Target marked some articles but continued to sell or ship unmarked articles, you should determine the date when Maxwell or Target consistently marked substantially all of the patented articles and unmarked products were no longer being distributed by Maxwell or Target. The num-

ber of articles seen by defendants does not control the issue of marking. Rather, you should focus on whether Maxwell or Target performed the statutory duty of giving notice by marking the patented articles and distributing only marked products. Jury Inst. No. 44. The jury found that Maxwell was in compliance with the marking statute as of November 1987.

In attacking the marking date found by the jury, J. Baker contends that the jury failed to account for the time period which would be required for Target to sell off unmarked inventory. There was evidence that Target completed the effort to change over marking from patent pending to the patent number by October 1987 for shoes and November 1987 for boots. Vendors who sold shoes to Target were notified months before October 1987 of the need to make these changes in marking. J. Baker concedes that there is evidence to support the finding that substantially all shoes received by Target in or after October 1987 were marked with the patent number. J. Baker argues, however, that it would have taken Target between 6 and 12 months to sell inventory received before October 1987. This argument ignores the evidence which supports the marking date set by the jury. The jury heard evidence that it would take less than two months for Target to sell its inventory. Eight or nine months elapsed between the initial notice sent from Maxwell to Target and the November 1987 marking date. A reasonable jury could have found that Target had ample time to sell its unmarked inventory before November 1987 and after that date distributed only shoes and boots marked with the patent number.

J. Baker also focuses on floor buy shoes or shoes purchased from dealers stock. Such footwear is imported by vendors or other third parties for potential sale to Target and other retailers. Joy Shaffer, a shoe buyer for Target, testified that the number of shoes purchased from dealer stock was not more than 10 percent. Her testimony apparently included all footwear and was not limited to shoes and boots attached with the patented loop system. Shaffer testified that Target purchased dealer stock shoes from vendors who had been instructed to mark the loops on such shoes with the patent number. She also stated that Target expected the vendors to comply with the marking instructions. Shaffer said that Target preferred to buy marked shoes from dealer stock but admitted that if push came to shove she would buy shoes from a vendor even if they were not marked with the patent number. Based on Shaffer's testimony, J. Baker speculates that a significant number of dealer stock shoes purchased by Target were not marked. Considering all the inferences in favor of Maxwell, a reasonable jury could have found that substantially all the dealer stock shoes purchased by Target after November 1987 were marked with the patent number. The court concludes that the marking date fixed by the jury is supported by substantial evidence and, therefore, must be sustained.

## 5. Damages

When a patent owner's right to exclude others from making, using, or selling the claimed invention is infringed, the patent owner is authorized to obtain compensation in the form of damages. 35 U.S.C. § 284. The statute requires that the amount awarded be sufficient to compensate Maxwell for her loss due to J. Baker's infringement and, in any event, may not be less than a reasonable royalty. *Id.*[9] Maxwell did not seek damages based on lost profits but sought to recover damages measured by a reasonable royalty for J. Baker's unauthorized use of the patented invention.

The jury was charged with determining the monetary amount which would fairly compensate Maxwell for the actual damages caused by J. Baker's infringement. The jury was instructed that:

The owner of a patent is entitled to an award of damages "adequate to compensate for the infringement but in no event

---

**9.** Title 35 U.S.C. § 284 provides in part:
Upon finding for the claimant [patent owner] the court shall award the claimant damages adequate to compensate for the infringement,

but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

less than a reasonable royalty for the use made of the invention by the infringer." A reasonable royalty as a measure of recovery is intended to provide just recovery to the owner of an infringed patent. If you should find that Maxwell has sustained damages, the minimum amount of monetary damages that you may award is a reasonable royalty.

To determine a reasonable royalty rate, the jury was told to decide what Maxwell and J. Baker, as a willing licensor and willing licensee, would have agreed upon during hypothetical negotiations. The court also reminded the jury that Maxwell could not recover a sum greater than the actual monetary loss suffered because of J. Baker's infringement.

The jury determined that $.05 was a reasonable royalty rate per pair of shoes and that J. Baker had sold 31,000,000 shoes using the patented invention between November 1987 and August 1993. The jury found that the damages suffered by Maxwell as a result of J. Baker's infringement exceeded the reasonable royalty and awarded additional compensatory damages of $1,500,000.[10] J. Baker argues that there is no evidence to support the award of damages in addition to the royalty awarded. J. Baker also challenges the evidentiary basis for the royalty rate set by the jury as well as for damages associated with particular types of shoes.

### A. Royalty Rate

■ J. Baker insists that its offer of one cent per pair of shoes and Maxwell's counteroffer of three cents per pair establish the parameters of a reasonable royalty. One who chooses not to accept a license that is offered, however, may not later rely on the license royalty rate as the measure of damages. *See, e.g., Beatrice Foods Co. v. New England Printing & Lithographing Co.,* 899 F.2d 1171, 1173 (Fed.Cir.1990). J. Baker chose not to accept the license offered to it

by Maxwell. J. Baker may not rely on that offer now to curtail Maxwell's recovery.

■ J. Baker contends that the jury's award of a royalty rate of five cents per pair of shoes is unduly speculative. The court disagrees. The jury considered various royalty rates—one cent, three cents and six cents—discussed during unsuccessful prior negotiations between the parties. The jury heard evidence that Maxwell had licensed her patented system to Elan–Polo, a vendor, for ten cents per pair of shoes. Maxwell provided expert testimony that a reasonable royalty rate as to J. Baker would be ten cents per pair.[11] The jury had before it "such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed.Cir.1984). Thus, the jury's assessment of a royalty rate of five cents per pair of shoes is supported by substantial evidence.

### B. Additional Compensatory Damages

■ Damages cannot be recovered, of course, unless there is evidence to establish a basis for such recovery. J. Baker asserts, and the court agrees, that there is no basis for Maxwell to recover lost profits. Maxwell is not entitled to recoup lost profits as such damages are recoverable only where the infringing activity directly competes with the patent owner's sales. *State Indus., Inc. v. Mor–Flo Indus., Inc.,* 883 F.2d 1573, 1577 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990). The court cannot agree, however, that the amount of additional damages resulted from speculation and conjecture on the part of the jury. Indeed, the damage instruction specifically cautioned against such reasoning. Considering all the inferences in favor of Maxwell, the court concludes that the compensatory dam-

---

10. The jury provided the following answers in response to interrogatories in the special verdict form:

10. If you find that J. Baker infringed the Maxwell patent, was Maxwell damaged in excess of the amount of a reasonable royalty as a result of the infringement?
A: Yes.

11. What amount of money will compensate Maxwell for additional damages, if any, she sustained as a result of the infringement?
A: $1,500,000.

11. There was also testimony that the price of the patented shoe connection system would be comparable to the price for lining and boxes which ranged from ten to fifty cents.

ages awarded by the jury are supported by substantial evidence and are not excessive.

■■■ The measure of damages for patent infringement is the amount which will compensate the patent owner for pecuniary loss sustained because of infringement. *State Indus.*, 883 F.2d at 1577. The floor for a damage award is no less than a reasonable royalty. Damages greater than a reasonable royalty may be awarded where necessary to adequately compensate the patent owner for the infringement. If it were otherwise, "the infringer would have nothing to lose, and everything to gain if he could count on paying only the normal, routine royalty noninfringers might have paid." *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed.Cir. 1983) (quoting *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir.1978)). Such an increase may be stated either as a reasonable royalty for an infringer or an increase in the reasonable royalty rate determined by the trier of fact. *Id.*

■■■ There was evidence that the rates Maxwell offered to J. Baker were artificially low due to ongoing infringement of her patent by J. Baker and others in the industry. Maxwell testified that the rates offered were not an accurate measure of her damages because widespread disregard of her patent forced her to offer licenses based on a diminished royalty. The jury apparently accepted that the rates were indeed artificially depressed. While the question may be a close one, the court concludes that a reasonable jury, based on the evidence here, could have found that the royalty rate of five cents did not fully compensate Maxwell for the damages she sustained as a result of J. Baker's infringement.

Maxwell is entitled to recover the amount, although it may be difficult to ascertain precisely, which compensates her for pecuniary damages she suffered because of J. Baker's infringement. As Maxwell notes, the jury could have plausibly understood the instructions as directing them to award as a reasonable royalty the minimum figure that two

hypothetical, willing parties would agree upon. To adequately compensate Maxwell for her actual damages, however, the jury awarded additional compensatory damages to effectively increase the royalty as applied to the infringer here, J. Baker. The total compensatory award of $3.05 million is much less than the $7 million Maxwell sought and corresponds to a royalty rate as applied to J. Baker of slightly less than ten cents per pair of shoes. The court concludes that a royalty rate of nearly ten cents is supported by substantial evidence.

### C. Other Challenges

J. Baker contends that Maxwell should not recover for shoes sold by J. Baker before 1990 because there is no evidence that any shoes incorporated a fabric loop under the insole as opposed to under the sock lining. J. Baker's argument erroneously presumes that the shoe connection systems it used before 1990 did not infringe the '060 patent. As discussed above, there is substantial evidence to support a finding that J. Baker's "under the sock" system was identical in practice to the shoe connection system described in the '060 patent and, therefore, literally infringed the patent claims. Accordingly, Maxwell is entitled to recover for damages she sustained as a result of the infringement.

■■■ J. Baker also asserts that Maxwell cannot recover damages for boots because she failed to establish the quantity of boots for which the fabric loop extended above the top of the boot upper. A reasonable jury could have found that the system used by J. Baker to connect mated pairs of boots infringed the '060 patent. J. Baker's own purchase orders for boots using loop connection systems directed that the loops be inserted two inches below the top line. The jury could reasonably find that loops inserted pursuant to those instructions would not extend above the top of the boot upper. There was no evidence that J. Baker sold any boots where the loops were connected at the top of the boot upper or extended above the top line of the boot.[12] The court concludes that

---

12. In support of its argument, J. Baker cites one pair of boots with loops connected near the top

of the boot upper. The boots, however, were not sold by J. Baker.

there is substantial evidence to support the jury's finding that Maxwell is entitled to recover for damages she sustained as a result of infringing boots sold by J. Baker.

■■ Finally, J. Baker contends that Maxwell should not recover damages for any shoes because she failed to prove what percentage of the shoes sold by J. Baker were lined as opposed to unlined. The evidence, taken in favor of Maxwell, was sufficient for a jury to find that J. Baker used the top line system on lined footwear. Moreover, there is no evidence that the jury included any pairs of unlined shoes in its damage calculations. J. Baker's speculative argument to the contrary does not provide a basis for disturbing the jury's award of damages.

J. Baker focuses on its own evidence while disregarding the evidence which supports the damages awarded by the jury. The court notes that Maxwell, as the patentee, need not prove infringement damages with absolute certainty, but need only provide a reasonable basis for estimating her losses. While J. Baker was not expected to maintain separate records before it had notice of infringement, it must bear any adverse consequences for uncertainty caused by its failure to keep accurate or complete records after being charged with infringement in 1990. *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983). The jury could have reasonably found that J. Baker's conduct prevented Maxwell from accurately determining damages or made it more difficult for her to do so. Accordingly, it was within the jury's province to resolve all doubts against J. Baker and determine damages based on the best available evidence. *Id.* The court is satisfied that the jury's award of damages is based on products found to have actually infringed the '060 patent and is supported by substantial evidence.

## 6. Laches

■■ J. Baker raises the affirmative defense of laches as a bar to recovery of damages for any infringing activity that occurred prior to Maxwell filing suit in December 1990. J. Baker accuses Maxwell of waiting too long to bring suit and argues that it was prejudiced by the delay. To prevail on a laches defense, J. Baker had the burden of proving that:

(1) Maxwell delayed filing suit for an unreasonable and inexcusable length of time after she knew or reasonably should have known of her cause of action against J. Baker; and

(2) J. Baker was materially prejudiced by the delay.

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed.Cir.1992). J. Baker asserts that Maxwell was aware of infringement by J. Baker and the rest of the industry for years but made no effort to notify potential infringers until April 20, 1990. Maxwell responds that J. Baker has established neither undue delay or material prejudice.

The question of laches was submitted to the jury on an advisory basis. The jury found that J. Baker was not materially prejudiced by any delay on the part of Maxwell in filing suit. That finding is supported by substantial evidence. J. Baker urges the court to exercise its discretion and disregard the jury's finding concerning this equitable defense. After considering the evidence and arguments offered by both parties on this issue, the court, based on its independent knowledge of the circumstances in this case, also rejects the laches defense asserted by J. Baker.

■■ In determining whether the defense of laches applies, the court takes into account all the particular facts and circumstances of the case and weighs the equities of the parties. Laches involves more than the passage of time. Delay in bringing suit is not sufficient for a finding of laches; rather, the delay must be unreasonable and unexcused. The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances. *Aukerman*, 960 F.2d at 1032. The period of delay is measured from the time Maxwell knew or reasonably should have known of J. Baker's alleged infringing activities to the date of suit. Reasons or justification offered by Maxwell must be considered in assessing whether the delay was undue.

Material prejudice to J. Baker resulting from Maxwell's silence or delay is essential to the laches defense. Evidentiary prejudice may occur where a defendant is unable to present a full and fair defense on the merits of the case, due to the loss of records, the death of a witness or the unreliability of memories of long past events. *Id.* Economic prejudice is a more difficult concept. Economic prejudice may consist of the loss of monetary investments or damages incurred which would have been prevented by earlier suit. *Id.* Such damages, however, cannot merely be those attributable to a finding of infringement. Rather, J. Baker must demonstrate that, during the period of inaction, it changed its economic position because of the delay. On the other hand, Maxwell cannot intentionally remain silent and allow her damages to rise, where J. Baker, if notice had been given, could have switched to a noninfringing product. *Id.*

J. Baker contends that Maxwell was aware, at the time her patent issued, of widespread use within the industry of a shoe connection which she believed to infringe her patent. Maxwell admitted she knew before the patent issued that people within the industry were copying her shoe connection system. Maxwell notified vendors, including J. Baker's vendors, of the patent in 1987. She did not, however, directly notify retailers of her patent until three years later. The reasons offered by Maxwell for the delay included investigating the extent of infringement in the industry, lack of resources and the need to develop a mechanism for enforcing her patent.

On April 20, 1990, Maxwell sent a copy of the '060 patent along with a letter to nearly 200 discount retailers, including J. Baker. The letter inquired whether the retailer used or contemplated using the shoe connection system claimed in the patent. The letter stated that Maxwell was the owner of the patented system and invited discussions concerning licensing arrangements. J. Baker responded to the letter and engaged in settlement discussions with Maxwell. The negotiations broke down in September 1990.

The court finds that the evidence does not support J. Baker's laches defense. Although

Maxwell failed to immediately file suit, the evidence does not establish that the delay of slightly more than three years was unreasonable. Maxwell filed suit in December 1990 well within the six year statute of limitations. The court also finds that the reasons offered by Maxwell excused any delay. While Maxwell suspected that retailers in the industry were pirating her invention, the court is not convinced that Maxwell intentionally remained silent and allowed her damages to escalate.

The evidence also fails to show that J. Baker would have switched to a noninfringing product had earlier notice been given. Once notified of the patent by Maxwell, J. Baker made a quick decision to move the location of the loops without examining the patent language or consulting counsel. The jury found that the shoe connection systems adopted by J. Baker in 1990 infringed the '060 patent and that the infringement was willful. There is no reason to believe that J. Baker would have acted differently had earlier notice been provided.

J. Baker contends that it suffered evidentiary prejudice due to Maxwell's delay in filing suit. J. Baker argues that it was denied the opportunity to keep separate records for potentially infringing products and that the passage of time impaired its ability to quantify the extent of its infringement. J. Baker has not shown any relationship between its activities and Maxwell's inaction. J. Baker did not establish separate records once it was aware of Maxwell's patent and was charged with infringement. From all that appears, J. Baker's would have maintained the same records regardless of what Maxwell did or did not do. J. Baker also argues that the delay prevented it from gathering evidence relevant to the issue of marking. The court is unpersuaded, however, that J. Baker has suffered material prejudice as a result of Maxwell's delay in bringing suit. The losses incurred by J. Baker during that period are attributable to its liability for infringement. Accordingly, the court finds that J. Baker has not demonstrated any economic prejudice suffered as a result of Maxwell's delay.

## CONCLUSION

J. Baker attempts to retry this case under the guise of a motion for judgment as a matter of law. After reviewing all of the evidence in the light most favorable to Maxwell and giving her the benefit of all favorable inferences, the court concludes that substantial evidence supports the jury's verdict. Based on the foregoing, **IT IS HEREBY ORDERED** that defendant J. Baker's motion for judgment as a matter of law under Fed.R.Civ.P. 50 is denied.