Susan M. MAXWELL, Plaintiff–Appellee,

v.

J. BAKER, INC., Defendant–Appellant,

and

Prange Way, Inc., Defendant.

Nos. 95–1292, 95–1293 and 95–1355.

United States Court of Appeals, Federal Circuit.

June 11, 1996.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Aug. 28, 1996.

---

Earl D. Reiland, Merchant, Gould, Smith, Edell, Welter & Schmidt, P.A., Minneapolis, Minnesota, argued, for plaintiff-appellee. With him on the brief were Daniel W. McDonald, and Alan G. Gorman.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., argued, for defendant-appellant. Of counsel were Henry C. Dinger, John C. Englander, and Dana L. McAlister, Goodwin, Procter & Hoar, Boston, Massachusetts.

Before LOURIE, Circuit Judge, SKELTON, Senior Circuit Judge, and SCHALL, Circuit Judge.

LOURIE, Circuit Judge.

J. Baker, Inc. appeals from the final judgment of the United States District Court for the District of Minnesota in which the court denied J. Baker's motion for judgment as a matter of law after a jury verdict of infringement of claims 1, 2, and 3 of U.S. Patent 4,624,060, owned by the inventor, Susan M. Maxwell. *Maxwell v. J. Baker, Inc.*, 875 F.Supp. 1371 (D.Minn.1995). Because the court erred when it denied J. Baker's motion for judgment as a matter of law on the issue of infringement, but did not err otherwise, we affirm-in-part, reverse-in-part, vacate-in-part, and remand.

## BACKGROUND

In retail shoe stores, pairs of shoes must be kept together to prevent them from becoming disorganized and mismatched. Typically, manufacturers connect pairs of shoes using plastic filaments threaded through each shoe's eyelets. However, some shoes do not have eyelets and cannot be connected in this manner. Thus, manufacturers have resorted to other methods of keeping the shoes together such as making a hole in the side of each shoe and threading a filament through these holes. This method creates problems for retailers and manufacturers because the shoes are damaged by the process.

Maxwell, an employee at a Target retail store, recognized this problem and invented a system for connecting shoes that do not have eyelets. She secured tabs along the inside of each shoe and connected the shoes with a filament threaded through a loop or hole in each tab. By securing the tabs inside the shoe, she preserved the integrity and appearance of the shoes.

Maxwell filed a patent application entitled "System for Attaching Mated Pairs of Shoes Together," which issued as the '060 patent on November 25, 1986. Figure 2 of the patent illustrates the preferred embodiment of the invention and is shown below.

FIG. 2

Claim 1, with reference numbers to figure 2 added, is representative of the claims at issue: [1]

1. A system for attaching together mated pairs of shoes, which comprises in combination:

(A) a pair of shoes, each of which has an inner sole [16] and an outer sole [15], each shoe also having a shoe upper with an inside surface [17] and a top edge, *each of said shoes further having a fastening tab [12] and means for securing said tab between said inner and outer soles,*

(1) said fastening tab [12] being an integral sheet with two parts,

(2) the first of said parts [13] comprising one end of the elongated tab [12] extending horizontally between the inside surfaces of the outer sole [15] and inner sole [16] of the shoe and firmly secured thereto with said securing means,

(3) the second of said parts [14] comprising *the opposite end of the elongated tab [12] extending from one edge of the inner sole [16] and verti-cally upward along but spaced from the inside surface of the shoe upper [17]* and extending so that said opposite end remains beneath the top edge of said shoe upper,

(4) the second of said parts [14] having an aperture in the form of a loop formed by doubling the fastening tab [12] over on itself, and

(B) a filamentary fastening element [19] extending through the apertures of each of said fastening tabs [12], the ends of the filamentary element [19] being joined together in a closed loop;

whereby said pair of shoes is attached together by said fastening element [19] passing through the aperture in each of said tabs [12] so that on removal of said fastening element [19], said shoes separate and said tabs [12] are not visible outside said shoe uppers [emphasis added].

J. Baker sells and distributes shoes through leased footwear departments in retail stores. Under a typical leasing arrangement, a retail store provides J. Baker with

---

1. Claim 2 is dependent upon claim 1. Claim 3 contains essentially the same limitations as to the location of the fastening tab, but describes the use of the tab with a hole at its end instead of a tab folded over to form a loop. Col. 4, ll.10–44.

the exclusive right to operate a shoe department within the store. J. Baker selects the merchandise, stocks the shelves at the stores, and serves the customers. In exchange, the retail store receives a portion of the sales receipts.

J. Baker purchases the shoes it sells from independent manufacturers. Between the mid–1980's and 1990, J. Baker instructed its manufacturers to connect shoes together for sale using a fabric loop inserted under a shoe's sock lining (the "under the sock lining" version) as shown below.

In June 1990, Maxwell informed J. Baker's in-house counsel that she believed that J. Baker infringed the '060 patent. In response, J. Baker designed two alternate shoe connection systems. In the "counter pocket" version, shown below, a tab was stitched into the counter pocket of the shoe between the sole and the top of the shoe.

In the "top line" version, shown below, a tab was stitched into the top lining seam of the shoe.

Maxwell sued J. Baker on December 12, 1990, alleging infringement of the '060 patent. After a month long trial, a jury returned a special verdict finding that the '060 patent was valid; J. Baker infringed claims 1, 2, and 3 of the patent; and J. Baker's infringement was willful after June 1990, when it received actual notice of the '060 patent. The jury also determined that Maxwell complied with the marking requirements of 35 U.S.C. § 287(a) as of November 1987. Thus, it awarded over $1.5 million in damages based on its determination that a reasonable royalty for use of Maxwell's patent was $.05 per pair of shoes and J. Baker sold 31 million infringing pairs of shoes. In addition, the jury awarded Maxwell an additional $1.5 million based on its determination that Maxwell was damaged in excess of the $.05 royalty.

J. Baker filed a motion for judgment as a matter of law and a motion for a new trial arguing, *inter alia*, that J. Baker did not infringe either literally or by equivalence, the marking date fixed by the jury was not supported by substantial evidence, the amount of damages awarded in excess of the reasonable royalty award was not supported by any evidence, and the '060 patent was invalid based on prior inventorship. The court de-

nied J. Baker's motions. *Maxwell*, 875 F.Supp. at 1375. In addition, it awarded prejudgment interest, trebled damages for shoe sales after June 1990 based on the jury's willful infringement finding, directed an award of attorney fees, and entered an injunction preventing J. Baker from making, using, or selling any shoes connected with a system covered by the patent. *Maxwell v. J. Baker, Inc.*, 879 F.Supp. 1007 (D.Minn.1995) (awarding prejudgment interest, enhanced damages, and attorney fees); *Maxwell v. J. Baker, Inc.*, 879 F.Supp. 1012 (D.Minn.1995) (entering an injunction against J. Baker). J. Baker appeals.

## DISCUSSION

When a party moves for JMOL in a case tried to a jury, we review the district court's decision *de novo* by reapplying the JMOL standard. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975, 34 USPQ2d 1321, 1326 (Fed.Cir.1995), *aff'd on other grounds*, —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). Judgment as a matter of law against a party is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable

jury to find for that party on that issue...." Fed.R.Civ.P. 50(a)(1). We review the legal standards that the jury applied in reaching its verdict to determine whether they were correct as a matter of law. *Markman*, 52 F.3d at 975, 34 USPQ2d at 1326. We review the jury's resolution of all factual disputes for substantial evidence. *Id.*

## A. Infringement

■ An infringement analysis requires two separate steps. First, the court must construe the claims asserted to be infringed as a matter of law in order to establish their meaning and scope. *Markman v. Westview Instruments, Inc.*, —— U.S. ——, ——, 116 S.Ct. 1384, 1393, 134 L.Ed.2d 577, 588–89, 38 USPQ2d 1461, 1471 (1996). Second, the claims as construed are compared to the allegedly infringing device. *Id.* To literally infringe, the accused device must contain every limitation of the asserted claim. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535, 19 USPQ2d 1367, 1369 (Fed.Cir.1991). Even if the accused device does not literally infringe, it may infringe under the doctrine of equivalents if the differences between the claimed invention and the accused device are "insubstantial." *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1517, 35 USPQ2d 1641, 1644–45 (Fed.Cir.1995) (in banc) (per curiam), *cert. granted*, —— U.S. ——, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996).

### 1. Claim Construction

■ Both parties agree that the key claim limitation for purposes of this appeal concerns Claim 1's requirement that a "fastening tab" extend "horizontally between the inside surfaces of the outer sole and inner sole of the shoe." Col. 3, 11. 34–36. The district court construed the claim language to require that the fastening tab extend from between the inner and outer shoe soles. Moreover, the court construed the claim to require that the fastening tab be a separate piece from any other shoe part, including the counter pocket, the shoe lining, and the sock lining. *Maxwell*, 875 F.Supp. at 1379–80. On appeal, J. Baker does not challenge the court's claim construction. However, Maxwell asserts that its claims are broader than the district court's claim construction. In particular, she argues that the term "fastening tab" should be construed to cover a loop connected to a counter pocket lining, or other interior lining structure, which extends from between the shoe's soles.

We disagree with Maxwell's attempt to expand the claims. Claim 1 requires the tab to extend "from one edge of the inner sole and vertically upward along but spaced from the inside surface of the shoe upper." Claim 3 requires the tab to extend "upwardly along the inside surface of the shoe upper." Thus, both claims require a separate tab that extends along the shoe upper. Moreover, as Figure 2 of the patent illustrates, one of ordinary skill in the shoe industry would recognize that a shoe upper includes the outside portion of the shoe and the inside lining of the shoe. *See also* CUCCINELLI, MARIBETH, THE ART AND SCIENCE OF FOOTWEAR MANUFACTURING 64 (Norman V. Germany ed., 1974) (defining a shoe "upper" as "all of the upper parts of a shoe stitched together and ready for lasting and bottoming. It includes both the outside and lining of the shoe."). Thus, to accept Maxwell's claim interpretation that the inside lining of the shoe is part of the tab, we would have to ignore the claim limitations that require the tab to be separate from and extend along the shoe upper, which includes the inner shoe lining. *See Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171, 26 USPQ2d 1018, 1023 (Fed.Cir.1993) ("[T]o construe the claims in the manner suggested by TI would read an express limitation out of the claims. This we will not do...."); *see also Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1563, 19 USPQ2d 1500, 1504 (Fed.Cir.1991) ("Our interpretation gives full effect to the recitation of two distinct elements in the claimed structure: linear border pieces and right angle corner border pieces.").

Neither the patent specification nor the prosecution history indicates that the claims should be interpreted differently. To the contrary, the specification makes clear that the claims, as properly construed, require the fastening tab to be separate from the inside shoe lining. The specification indicates that

"the [fastening] tab extends around the edge of the inner sole of the shoe and vertically upwardly along the inside surface of the upper body of the shoe, but spaced therefrom." Col. 1, 11. 62–66. In addition, the specification suggests that the fastening tab, as an alternative to placing it between the inner and outer soles, may be "stitched *into a lining seam* of the shoes at the sides or back of the shoes [emphasis added]." Col. 2, 11. 42–43. Accordingly, Maxwell must have contemplated that the tab be separate from the shoe's lining seam in order for the tab to be stitched into the lining. Thus, the court properly construed the claims to require the fastening tab to be a separate piece from the counter pocket lining or other inside shoe lining.

### 2. *J. Baker's "Under the Sock Lining" Version*

■ J. Baker argues that, despite the district court's proper claim construction, substantial evidence does not support the jury's verdict that the shoes sold by J. Baker before 1990 infringed. In particular, J. Baker asserts that it ordered shoes from manufacturers requesting that the fastening tab be located "under the sock," not between the inner and outer soles. Because the claims require that the tab be secured between the inner and outer soles, J. Baker asserts that it did not infringe.

We disagree. Maxwell presented exhibits and testimony that, despite J. Baker's instructions to place the fastening tabs "under the sock," J. Baker's manufacturers supplied shoes with the tabs placed between the inner and outer soles. J. Baker even admits that some shoes were supplied by its manufacturers with the tabs located between the soles, but responds that it is "implausible" that all the shoes were supplied with the tabs between the soles. However, it did not come forward with any evidence that its manufacturers complied with its instructions or that any shoes were supplied with the tabs "under the sock lining." Thus, based on the evidence that Maxwell presented, a reasonable jury could have found that all the shoes with the "under the sock" system were supplied

with the tab between the soles and therefore infringed.

### 3. *J. Baker's "Counter Pocket" and "Top Line" Versions*

Based on its proper claim construction that the claimed "fastening tab" does not include a shoe's inner lining, the district court held that no reasonable jury could have found literal infringement in J. Baker's use of the "counter pocket" and "top line" fastening systems. *Maxwell*, 875 F.Supp. at 1380. In particular, the court found that these versions did not secure the fastening tabs between the inner and outer soles of the shoes as required by the claims. However, the court denied J. Baker's JMOL motion on the issue of infringement because it determined that substantial evidence supported the jury's finding of infringement under the doctrine of equivalents. *Id.* at 1380–84.

J. Baker argues that the district court erred in sustaining the jury's verdict, asserting that Maxwell dedicated to the public the use of a fastening tab attached to a shoe lining by disclosing that alternate system in the specification, but failing to claim it. In particular, J. Baker relies on Maxwell's disclosure in the specification that "[a]lternatively, the tabs may be stitched into a lining seam of the shoes at the sides or back of the shoes," col. 2, 11. 41–43, asserting that this language describes the accused shoes. Maxwell counters, relying on the Supreme Court's decision in *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328 (1950), that the inclusion of the alternative description in the specification actually supports a finding of equivalence. We agree with J. Baker.

■ In *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 19 USPQ2d 1500 (Fed.Cir. 1991), we reiterated the well-established rule that "subject matter disclosed but not claimed in a patent application is dedicated to the public." 939 F.2d at 1562–63, 19 USPQ2d at 1504. *See also Miller v. Bridgeport Brass Co.*, 104 U.S. 350, 352, 26 L.Ed. 783 (1881) ("[T]he claim of a specific device or combination, and an omission to claim other devices or combinations apparent on

the face of the patent, are, in law, a dedication to the public of that which is not claimed."). We have frequently applied this rule to prohibit a finding of literal infringement when an accused infringer practices disclosed but unclaimed subject matter. *E.g., Environmental Instruments, Inc. v. Sutron Corp.,* 877 F.2d 1561, 1564, 11 USPQ2d 1132, 1134 (Fed.Cir.1989). This rule, however, applies equally to prevent a finding of infringement under the doctrine of equivalents. A patentee may not narrowly claim his invention and then, in the course of an infringement suit, argue that the doctrine of equivalents should permit a finding of infringement because the specification discloses the equivalents. Such a result would merely encourage a patent applicant to present a broad disclosure in the specification of the application and file narrow claims, avoiding examination of broader claims that the applicant could have filed consistent with the specification. *See Genentech, Inc. v. Wellcome Found. Ltd.,* 29 F.3d 1555, 1564, 31 USPQ2d 1161, 1167 (Fed.Cir.1994) ("An applicant should not be able deliberately to narrow the scope of examination to avoid during prosecution scrutiny by the PTO of subject matter ... and then, obtain in court, either literally or under the doctrine of equivalents, a scope of protection which encompasses that subject matter."); *International Visual Corp. v. Crown Metal Mfg. Co.,* 991 F.2d 768, 775, 26 USPQ2d 1588, 1593 (Fed.Cir.1993) (doctrine of equivalents should not extend to disclosed, but unexamined, subject matter) (Lourie, J., concurring). This is clearly contrary to 35 U.S.C. § 112, which requires that a patent applicant "particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 (1994). It is also contrary to our system of patent examination, in which a patent is granted following careful examination of that which an applicant claims as her invention. Thus, we agree with J. Baker that subject matter disclosed in the specification, but not claimed, is dedicated to the public.[2]

The Supreme Court's decision in *Graver Tank* is not to the contrary. In *Graver Tank,* the Court affirmed a district court's finding that the defendant infringed composition claims 18, 20, 22, and 23 of U.S. Patent 2,043,960, which claimed a composition for electric welding containing "a major portion of alkaline earth metal silicate." The accused material contained manganese silicate, which is not an alkaline earth metal silicate. The specification, however, disclosed that manganese silicate, among other silicates, could also be used in the composition, but that the inventors preferred to use alkaline earth metal silicates. The Court affirmed a finding of infringement under the doctrine of equivalents based on the district court's finding that "for all practical purposes, manganese silicate can be efficiently and effectually substituted for [alkaline earth metal silicates] as the major constituent of the welding composition." *Graver Tank,* 339 U.S. at 612, 70 S.Ct. at 858, 85 USPQ at 331.

Despite its reliance on the patentee's disclosure in the specification of the use of manganese in the welding composition to support a finding of infringement under the doctrine of equivalents, the Court in *Graver Tank* was not confronted with the same factual situation as we are here. As issued, the '960 patent included broad composition claims drawn to a welding material comprising "metallic silicate and calcium fluoride." In other words, contrary to the situation here, the patentee in *Graver Tank* claimed the use of manganese silicate. However, the Court affirmed the district court's decision in which it held these broad claims to be invalid on the ground that many metal silicates embraced by the claims, but not disclosed in the specification, were inoperative. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 336 U.S. 271, 276–77, 69 S.Ct. 535, 538–39, 93 L.Ed. 672, 80 USPQ 451, 453 (1949). Thus, by filing claims in the patent application that encompassed a welding composition containing metal silicates, including manganese silicates as disclosed in the specification, the patentee could not be said to have dedicated such an embodiment of the invention to the

---

**2.** Of course, within two years from the grant of the original patent, a patentee may seek reissuance of the patent and attempt to enlarge the scope of the claims to include the disclosed but previously unclaimed subject matter. 35 U.S.C. § 251 (1994).

public, even if the broad claims encompassing the embodiment were later held invalid.

■ Here, Maxwell limited her claims to fastening tabs attached between the inner and outer soles. She disclosed in the specification, without claiming them, alternatives in which the fastening tabs could be "stitched into the lining seam of the shoes." Col. 2, l. 42. By failing to claim these alternatives, the Patent and Trademark Office was deprived of the opportunity to consider whether these alternatives were patentable.[3] A person of ordinary skill in the shoe industry, reading the specification and prosecution history, and interpreting the claims, would conclude that Maxwell, by failing to claim the alternate shoe attachment systems in which the tabs were attached to the inside shoe lining, dedicated the use of such systems to the public. As a matter of law, J. Baker could not infringe by using an alternate shoe attachment system that Maxwell dedicated to the public. Therefore, we reverse the district court's decision denying J. Baker's JMOL motion that its "counter pocket" and "top line" systems did not infringe under the doctrine of equivalents. In addition, we vacate the court's award of enhanced damages and attorney fees based on the jury's verdict that J. Baker willfully infringed after it began using the "counter pocket" and "top line" systems. We further vacate the court's injunction to the extent it is contrary to our holding regarding infringement.

### B. *Damages*

In light of its infringement finding, the jury awarded Maxwell over $1.5 million in damages based on its determination that a "reasonable royalty" for use of Maxwell's patent was $.05 per pair of shoes and J. Baker sold 31 million infringing pairs of shoes. In addition, the jury awarded Maxwell another $1.5 million based on its determination that Maxwell was damaged in excess of the $.05 royalty. The court upheld the jury's verdict after J. Baker's JMOL motion, finding that the award was supported by substantial evidence. *Maxwell,* 875 F.Supp. at 1388.

■ J. Baker challenges the methodology the court instructed the jury to follow in calculating the amount of damages. It further argues that no evidence supports an award of damages in excess of the $.05 royalty rate. Thus, J. Baker asserts that the additional $1.5 million in damages must be vacated. We review the court's methodology used in calculating damages for an abuse of discretion. *Unisplay, S.A. v. American Electronic Sign Co.,* 69 F.3d 512, 517 n. 8, 36 USPQ2d 1540, 1544 n. 8 (Fed.Cir.1995). We review the jury's determination of the amount of damages, an issue of fact, for substantial evidence. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.,* 926 F.2d 1161, 1164 n. 2, 17 USPQ2d 1922, 1925 n. 2 (Fed.Cir.1991).

When infringement has been shown, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284 (1994). The district court here instructed the jury concerning the calculation of damages as follows:

> If you should find that Maxwell has sustained damages, the minimum amount of monetary damages that you may award is a reasonable royalty. A reasonable royalty is the amount of money which the owner of a patent would accept who is desirous of licensing another to use her patent in return for a royalty, but is not forced by financial need or other compulsion to do so, and the amount which a person would be willing to pay as a royalty who is desirous of obtaining a license to use the invention, but who is not compelled to do so.
>
> . . . .
>
> In determining a reasonable royalty, you are to imagine that a hypothetical negotiation took place between J. Baker and Maxwell at or about the time that J. Baker first infringed the patent. You must assume that Maxwell was willing to grant a license and that J. Baker was willing to accept one. . . .

---

3. Thus, this situation is different from that where prosecution history estoppel might apply, when broader claims were submitted and the claims were narrowed during prosecution.

In determining the result of such a hypothetical negotiation, you may consider facts and events that occurred after the alleged infringement began even though they would not have been known to the parties at the time of the hypothetical negotiation. . . .

You may also consider evidence bearing on the actual commercial consequences of the infringement, including the amount of money Maxwell may have lost due to the infringement. . . .

Maxwell contends that she was forced to offer licenses based on a diminished royalty because she felt that there was a widespread and open disregard of her patent rights.

J. Baker, on the other hand, contends that the patent had not been disregarded and that Maxwell's offers were consistent with her existing marketing program.

If you should find that the disregard of the patent forced Maxwell to seek a decreased royalty, you may determine that the rate offered by Maxwell was not a true measure of a reasonable royalty.

The court then asked the jury to answer the following special interrogatories as part of its verdict:

8. If you find that J. Baker infringed the Maxwell patent, what is a reasonable royalty rate per pair of shoes for use of the Maxwell patent?

9. What is the total number of pairs of shoes that J. Baker sold or used using the invention of the Maxwell patent during the period in which Maxwell is entitled to recover?

10. If you find that J. Baker infringed the Maxwell patent, was Maxwell damaged in excess of the amount of a reasonable royalty as a result of the infringement? If your answer to Question No. 10 is "Yes," then answer Question No. 11.

11. What amount of money will compensate Maxwell for additional damages, if any, she sustained as a result of the infringement?

Thus, the court asked the jury to determine both a "reasonable royalty" and additional damages necessary to compensate for the infringement.

The court did not abuse its discretion in presenting the damages issue to the jury in this fashion. The objective of the reasonable royalty calculation is to determine the amount necessary to adequately compensate for an infringement. *See Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1562, 219 USPQ 377, 386 (Fed.Cir.1983) ("[T]he amount of the royalty should be that amount which adequately compensates for the infringement."); *see also Fromson v. Western Litho Plate and Supply Co.,* 853 F.2d 1568, 1574, 7 USPQ2d 1606, 1612 (Fed.Cir.1988) ("The [reasonable royalty] determination remains one of *damages* to the injured party."). The determination is based in part upon a "hypothetical negotiation," which "requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began." *Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1554, 35 USPQ2d 1065, 1077 (Fed.Cir.1995) (in banc), *cert. denied,* — U.S. ——, 116 S.Ct. 184, 133 L.Ed.2d 122. This "hypothetical negotiation" is often referred to as a willing licensor and licensee negotiation. However, as we previously stated in *Rite–Hite,* this is an "absurd" characterization of the determination when the parties were previously unable to come to an agreement, *i.e.,* were not "willing," as in this case. *Id.* at 1554 n. 13, 35 USPQ2d at 1076 n. 13. Therefore, the use of a willing licensee-willing licensor model for determining damages "risks creation of the perception that blatant, blind appropriation of inventions patented by individual, nonmanufacturing inventors is the profitable, can't-lose course." *Fromson,* 853 F.2d at 1575, 7 USPQ2d at 1612. To avoid such a result, the fact finder may consider additional factors to assist in the determination of adequate compensation for the infringement. These factors include royalties received by the patentee for the licensing of the patent in suit, opinion testimony of qualified experts, the patentee's relationship with the infringer, and other factors that might warrant higher damages. *See Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120, 166 USPQ 235, 238 (S.D.N.Y.1970). The fact

that an infringer had to be ordered by a court to pay damages, rather than agreeing to a reasonable royalty, is also relevant. Under such an analysis, the district court would normally instruct the jury to return a damage award, based on a willing licensee-willing licensor negotiation and these other factors, in an amount sufficient to adequately compensate the patentee for the infringement. *See Fromson,* 853 F.2d at 1574–76, 7 USPQ2d at 1612–14.

In this case, the jury instruction tracked the requirements for a traditional reasonable royalty analysis. However, the special verdicts asked the jury to answer two separate inquiries, the amount of a "reasonable royalty" and the additional damages required to compensate for infringement. We do not find this to be an abuse of discretion. As the district court stated:

> the jury could have plausibly understood the instructions as directing them to award as a reasonable royalty the minimum figure that two hypothetical, willing parties would agree upon. To adequately compensate Maxwell for her actual damages, however, the jury awarded additional compensatory damages to effectively increase the royalty as applied to the infringer here, J. Baker.

875 F.Supp. at 1388. Thus, the court properly instructed the jury to award a reasonable royalty and then asked a separate inquiry. *See Stickle,* 716 F.2d at 1563, 219 USPQ at 387 ("[T]rial court may award an amount of damages greater than a reasonable royalty so that the award is 'adequate to compensate for the infringement.' ... Such an increase ... may be stated ... as a reasonable royalty *for an infringer* ... or as an increase in the reasonable royalty determined by the court...."). The first inquiry required the jury to determine the royalty that two willing parties would negotiate; the second inquiry required the jury to determine the increase

in the damages required to adequately compensate the patentee based on other relevant factors. In sum, the district court did not abuse its discretion in employing the methodology it did in instructing the jury as to the determination of Maxwell's damages.[4]

Moreover, substantial evidence supports the damages determined by the jury based on this methodology. The total compensatory award, based on sales of 31 million pairs of shoes (using the "under the sock" as well as the "counter pocket" and "top line" attachment systems), results in an effective royalty rate just below $.10 per pair of shoes. This rate is supported by evidence that Maxwell entered into agreements with other licensees at a royalty rate of $.10 per pair of shoes. *See Atlantic Thermoplastics Co. v. Faytex Corp.,* 5 F.3d 1477, 1482, 28 USPQ2d 1343, 1347 (Fed.Cir.1993) (relying on royalty offered by the patentee to a third party to support a reasonable royalty determination). In addition, Maxwell presented expert testimony that $.10 per pair of shoes was a reasonable royalty rate. *See* 35 U.S.C. § 284 ("The court may receive expert testimony as an aid to the determination ... of what royalty would be reasonable under the circumstances."). Thus, the jury did not arbitrarily increase the award of damages. Instead, the jury's verdict reflects the actual damages sustained by Maxwell from sales of shoes incorporating the "under the sock," "counter pocket," and "top line" attachment systems; it was not less than a reasonable royalty and is supported by substantial evidence.

In view of the fact that we have reversed the finding of infringement under the doctrine of equivalents with respect to Baker's "counter pocket" and "top line" attachment systems, however, we must vacate the award of damages and remand the case so that the trial court can determine the amount of damages for infringement resulting solely from

---

4. Our decision is not inconsistent with this court's recent decision in *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 38 USPQ2d 1288 (Fed.Cir. 1996). In *Mahurkar,* we held that a district court may not increase a reasonable royalty by a "kicker" based on litigation or other expenses. 79 F.3d at 1580–81, 38 USPQ2d at 1293. We further held that any enhanced damages and attorney fees must be awarded under sections 284 and 285 of the Patent Act. *Id.* Here, the court did not award enhanced damages or fees. Instead, pursuant to instructions from the court, the jury awarded damages adequate to compensate Maxwell for the infringement, as called for by the statute.

the sale of J. Baker's "under the sock" system, in a manner consistent with this opinion.

### C. *Marking*

J. Baker also argues that the court erred by denying its JMOL motion on the issue of patent marking under 35 U.S.C. § 287(a). J. Baker asserts that, as a matter of law, no damages may be awarded for infringement occurring before it had actual notice of the alleged infringement in June 1990, and that substantial evidence does not support the jury's verdict that Maxwell complied with the marking statute as of November 1987. In support, J. Baker relies on evidence that at least 5% of the shoes sold by Maxwell's licensee, Target, were not properly marked because Target failed to instruct some of its manufacturers to mark the patented systems.

In response, Maxwell argues that substantial evidence supports the jury's verdict. In particular, Maxwell asserts that she was diligent in enforcing Target's duty to mark, and Target successfully marked 95% of the shoes sold with the attachment system. Thus, she maintains that the court did not err when it denied J. Baker's JMOL motion on the issue of marking. We agree.

■■■ Section 287(a) of the Patent Act provides:

> Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent.... In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.

35 U.S.C. § 287(a) (1994). Thus, the statute defines that "[a patentee] is entitled to damages from the time when it either began marking its product in compliance with section 287(a)[, constructive notice,] or when it actually notified [the accused infringer] of its infringement, whichever was earlier."

*American Medical Sys., Inc. v. Medical Eng'g Corp.,* 6 F.3d 1523, 1537, 28 USPQ2d 1321, 1331 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1647, 128 L.Ed.2d 366 (1994). We have construed section 287(a) to require that "once marking has begun, it must be substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of the statute." *Id.* As the patentee, Maxwell had the burden of pleading and proving at trial that she complied with the statutory requirements. *See Motorola, Inc. v. United States,* 729 F.2d 765, 770, 221 USPQ 297, 300–01 (Fed.Cir. 1984); *see also Dunlap v. Schofield,* 152 U.S. 244, 248, 14 S.Ct. 576, 577, 38 L.Ed. 426 (1894) ("[T]he duty of alleging, and the burden of proving, either [actual notice or constructive notice] is upon the [patentee]."). Compliance with section 287(a) is a question of fact, and we review the court's denial of JMOL on the jury's resolution of the issue for substantial evidence.

■■■ A patentee who makes, uses, or sells its own invention is obligated to comply with the marking provisions to obtain the benefit of constructive notice. *See American Medical,* 6 F.3d at 1538, 28 USPQ2d at 1332 ("Full compliance was not achieved until [the patentee] consistently marked substantially all of its patented products, and it was no longer distributing unmarked products."). The marking provisions also apply to "persons making or selling any patented article for or under [the patentees]." 35 U.S.C. § 287(a). Thus, licensees, such as Target, and other authorized parties, such as Target's manufacturers, must also comply. *See Amsted Indus., Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178, 185, 30 USPQ2d 1462, 1467–68 (section 287(a) applies to express and implied licensees). However, with third parties unrelated to the patentee, it is often more difficult for a patentee to ensure compliance with the marking provisions. A "rule of reason" approach is justified in such a case and substantial compliance may be found to satisfy the statute. Therefore, when third parties are involved, the number of shoes sold without proper marking is not conclusive of the issue whether the patentee's marking was "substantially consistent and continuous." When the failure to mark is caused by

someone other than the patentee, the court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements. The rule of reason is consistent with the purpose of the constructive notice provision—to encourage patentees to mark their products in order to provide notice to the public of the existence of the patent and to prevent innocent infringement. *American Medical,* 6 F.3d at 1538, 28 USPQ2d at 1332.

Here, Maxwell, the patentee, made extensive and continuous efforts to ensure compliance by Target. There is evidence that Target, as licensee of Maxwell's patent, marked at least 95% of the shoes sold using the patented system. Because Target sold millions of pairs of shoes using the patented system, it is true that a numerically large number of shoes were sold without proper marking. Despite this, however, the evidence supports the jury's finding that Maxwell complied with the statute. Before the patent issued, Target agreed to mark "Patent Pending" on all pairs of shoes using Maxwell's shoe attachment system. After the patent issued on November 26, 1986, Maxwell notified Target to mark the patent number on all shoes using the patented system, as required by their license agreement. Initially, Target made no effort to change the marking from "Patent Pending" to recite the patent number. In response, Maxwell notified Target's manufacturers of the need to properly mark. Subsequently, Target agreed to properly mark shoes using the patented system by November 1987. Thereafter, on several occasions when Maxwell learned of Target's failure to properly mark shoes using the patented system after November 1987, she notified Target of the errors and requested that the shoes be properly marked in the future. Maxwell also presented evidence that, in response to her urging, Target used its best efforts to correct its failure to mark by instructing its manufacturers to properly mark in the future.

Thus, we find that substantial evidence supports the jury's determination that Maxwell complied with the marking statute as of November 1987. Most pairs of shoes using the patented attachment system were properly marked. Any deficiency in the marking was not due to Maxwell or any failure on her part to ensure compliance by her licensees; she diligently attempted to comply with the statutory marking requirements. Therefore, we affirm the district court's denial of J. Baker's JMOL motion on the issue of marking.

### D. *J. Baker's Other Arguments*

We have carefully considered J. Baker's remaining arguments, including its argument that the court erred by refusing to submit to the jury its argument based on Maxwell's failure to join all inventors in the patent application. We do not find these arguments to be persuasive.

### CONCLUSION

We affirm the finding that J. Baker's "under the sock lining" version of its shoes infringed the claims of the '060 patent. However, we reverse the court's denial of J. Baker's JMOL motion on the issue of infringement by the "counter pocket" and "top line" versions because Maxwell dedicated to the public the use of the alleged infringing devices by disclosing, but not claiming, such systems. Accordingly, we vacate the court's willful infringement finding, the award of actual and enhanced damages and attorney fees, and the court's injunction to the extent that it contradicts our holding. However, we approve the methodology the court used to calculate damages. We affirm the jury's conclusions that the '060 patent was not proved invalid and that Maxwell complied with the marking requirements of 35 U.S.C. § 287(a) as of November 1987. On remand, the court must redetermine the damages in a manner consistent with this opinion.

### COSTS

The parties shall bear their respective costs.

***AFFIRMED–IN–PART, REVERSED–IN–PART, VACATED–IN–PART, and REMANDED.***