**FISHER–PRICE, INC., Plaintiff–Cross Appellant,**

v.

**SAFETY 1ST, INC., Dorel Juvenile Group, Inc., and Dorel Design & Development, LLC., Defendants–Appellants.**

Nos. 03–1644, 04–1004.

United States Court of Appeals, Federal Circuit.

DECIDED: Aug. 16, 2004.

James J. Foster, Greenfield Wolf, for Defendants–Appellants.

William E. Wallace, III, Milbank Tweed, Washington, DC, for Plaintiffs–Cross Appellants.

Before MICHEL, SCHALL, and PROST, Circuit Judges.

## DECISION

SCHALL, Circuit Judge.

Defendants–Appellants Safety 1st, Inc., Dorel Juvenile Group, Inc., and Dorel Design and Development, LLC (collectively "Safety 1st") appeal the judgment of the United States District Court for the District of Delaware holding Safety 1st liable for infringement of United States Patent Nos. 5,947,552 (the "'552 patent"), 6,274,755 (the "'755 patent"), and Des. 431,940 (the "D'940 patent") and entering a permanent injunction in favor of Plaintiff–Cross Appellant Fisher–Price, Inc. ("Fisher–Price"). *Fisher–Price, Inc. v. Safety 1st, Inc.,* 279 F.Supp.2d 530 (D.Del.2003). Fisher–Price cross-appeals the district court's exclusion of certain evidence relating to damages for infringement of the '755 patent. Further proceedings on damages have been stayed pending appeal. We have jurisdiction pursuant to 28 U.S.C. § 1292(c).

On Safety 1st's appeal, we *affirm* the judgment of infringement with respect to the '552 and '755 patents. However, we *reverse* the judgment of infringement with respect to the D'940 patent. We therefore *affirm* the entry of the permanent injunction. On Fisher–Price's cross-appeal, we *modify* the district court's order relating to damages.

## DISCUSSION

### I.

The patents at issue relate generally to various carriers, strollers, and bassinets for infants. The '552 patent, entitled "Collapsible Bassinet/Infant Seat with Canopy," is directed to an "infant receptacle" that is "convertible between a bassinet configuration and an infant seat configuration." '552 patent, col. 1, ll. 66–67. The child can thus sit up or lie down, depending on the configuration of the product. The '755 patent, entitled "Child Carrier Harness," is directed to a child harness that includes "both a means for adjusting the harness ... while at the same time providing a comfortable seating/lying area that is relatively free of strap adjustment buckles or other obstructing harness restraint members." '755 patent, col. 1, ll. 51–55. The D'940 patent is a design patent covering an ornamental design for a "Children's Play Space." It is directed to a ribbed canopy-like structure that encloses, for example, an infant seat or bassinet. Fisher–Price is the assignee of all three patents.

The accused products are Safety 1st's Magic Motion Bassinet ("Magic Motion") and 2–in–1 Bouncenette ("Bouncenette"). These products are similar to each other in several ways. Both products are canopy covered bassinets designed to hold an infant that cannot crawl or walk. Both the Bouncenette and the Magic Motion products also have an infant support surface, part of which can be maintained in a angled position by two pairs of buckled straps, one pair supporting the left side of the surface and the other supporting the right side. There are three models of the Bouncenette. For clarity, we adopt the district court's nomenclature and refer to them as Bouncenettes 1, 2, and 3. *Fisher–Price,* 279 F.Supp.2d at 536 n.1.

### II.

On January 26, 2001, Fisher–Price filed suit against Safety 1st, alleging infringe-

ment of several patents, including the '552, '755, and D'940 patents. In response, Safety 1st asserted the affirmative defense of invalidity with respect to all three patents. In due course, the district court held a *Markman* hearing and issued an order construing the disputed terms of the '552 patent. *Fisher–Price, Inc. v. Safety 1st, Inc.*, 2002 WL 500572, 2002 U.S. Dist. LEXIS 5734 (D.Del.2002) (*"Markman Order"*). There were no disputed claim terms in the '755 patent or the D'940 patent. Consequently, there were no *Markman* proceedings as far as those patents were concerned. Following the *Markman Order*, the parties filed various summary judgment motions. The only one of these motions that was granted by the court was Safety 1st's motion for summary judgment of non-infringement under the doctrine of equivalents with respect to the '552 patent. *Fisher–Price, Inc. v. Safety 1st, Inc.*, 2002 WL 1307333, *13–14, *19–20, 2002 U.S. Dist. LEXIS 10569 *47, *59–60 (D.Del.2002) (*"Summary Judgment Order"*). The court denied all remaining summary judgment motions related to the three patents. *Id.* 2002 WL 1307333 at *13, 2002 U.S. Dist. LEXIS 10569 at *39.

A jury trial commenced on January 13, 2003. At the conclusion of the trial, the jury returned a verdict: (1) that Bouncenettes 1, 2, and 3, as well as the Magic Motion product, literally infringed claim 36 of the '552 patent; (2) that claim 36 of the '552 patent was not invalid by reason of obviousness or anticipation; (3) that Bouncenettes 1, 2, and 3, as well as the Magic Motion product infringed claims 1 through 16 of the '755 patent; (4) that the '755 patent was not invalid by reason of an inadequate written description; (5) that the Bouncenette 1 infringed the D'940

patent; (6) that the '755 and D'940 patents were not invalid due to the on-sale bar of 35 U.S.C. § 102(b); (7) that Fisher–Price began marking substantially all applicable products with the D'940 patent number on November, 16 2000; (8) that Safety 1st's infringement was willful; (9) that Fisher–Price was entitled to lost profits damages totaling $1,000,000 arising from infringement of the '552 and '755 patents; and (10) that Fisher–Price was entitled to $900,000 in lost profits damages arising from infringement of the D'940 design patent. *Fisher–Price*, 279 F.Supp.2d at 536.

Following the jury's verdict, the parties filed various motions for Judgment as a Matter of Law (*"JMOL"*) pursuant to Federal Rule of Civil Procedure Rule 50(b). While the district court found no basis to disturb most aspects of the jury's verdicts of liability,[1] it did grant a new trial on damages. *Id.* at 550, 554. Finally, the court entered a permanent injunction against Safety 1st.

Safety 1st appeals the district court's denial of its JMOL motions regarding (1) the validity of the '755 patent and D'940 patents, (2) infringement of the D'940 patent, (3) infringement of the '552 patent, and (4) the period for which damages may be recovered for infringement of the '552 and '740 patents. Additionally, Safety 1st appeals the district court's denial of its motion to amend its complaint to plead inequitable conduct with respect to the D'940 patent. For its part, Fisher–Price asserts on cross-appeal that the district court abused its discretion when it excluded evidence of infringement by one of the accused products from the damages retrial, even though the jury found infringement of that product by Safety 1st.

---

1. The district court overturned the jury's finding that the Bouncenette 3 product literally infringed claim 36 of the '552 patent. Fisher–Price does not appeal that ruling.

### III.

*A. Standard of Review*

We review a district court's decision to deny a motion for JMOL *de novo*, reapplying the same JMOL standard employed by the district court. *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1284 (Fed.Cir.2002). JMOL is appropriate only when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). On appeal, we must consider the record evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor "without disturbing the jury's credibility determinations or substituting [the court's] resolutions of conflicting evidence for those of the jury." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1376–77 (Fed.Cir.1998). Therefore, for Safety 1st to prevail on appeal, it must demonstrate that "the jury's findings presumed or express, are not supported by substantial evidence, or if they were, that the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1358 (Fed.Cir. 1998).

*B. Validity of '755 and D'940 patents under the on-sale bar*

■ Safety 1st had the burden of proving invalidity by clear and convincing evidence. *Cordis Corp. v. Medtronic Ave, Inc.*, 339 F.3d 1352, 1364 (Fed.Cir.2003). By special verdicts, the jury found that Safety 1st failed to show by clear and convincing evidence that products embodying the inventions of the '755 and D'940 patents were the subject of a commercial offer for sale in the United States prior to the critical dates for each patent. The ultimate question of whether an invention was placed on sale in violation 35 U.S.C. § 102(b) is a question of law, which we review *de novo*. *Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1358 (Fed. Cir.1999). However, the inquiry is inherently based on underlying questions of fact. *Id.*

The statutory on-sale bar applies when two conditions are satisfied before the critical date of one year prior to the filing date of the patent application: (1) the product embodying the claimed invention was the subject of a commercial offer for sale; and (2) the claimed invention was ready for patenting. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). Additionally, the statute also requires that the sale take place in the United States. 35 U.S.C. § 102(b). In the present case, there is no dispute that the claimed inventions were ready for patenting. The primary issue is whether the patents were the subject of a commercial offer for sale.

"Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed.Cir.2001). A requisite "formal" offer is defined as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir.2001) (quoting Restatement (2d) of Contracts, § 24 (1981)). "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude the bargain until he has made a further manifestation of assent." *Id.*

(quoting Restatement (2d) of Contracts, § 26 (1981)). In sum, whether or not the alleged offer in this case rose to the level of a commercial offer for sale is a factual question to be judged in view of the circumstances surrounding its making, taking into account such factors as the status of negotiations, the language of the documents, the terms of any previous inquiry, and the prior course of dealings between the parties. *See* 1 *Corbin on Contracts*, § 2.2 at pp. 1–2 (Joseph M. Perillo, Rev. ed. 1993); Restatement (second) of Contracts, § 26, cmt. c (1981).

The alleged offer for sale in the present case arises from the "In–Line" price quotations—or "Vendor Quotations"—from an Asian vendor (offeror) to Fisher–Price (offeree). For example, the "Dome Away From Home" In-line quotation, which relates to the D'940 patent, comprises a detailed price list (including yield, unit cost and total amount) for vendor supplied items such as material, labor, and packaging. The "Sit N Sleep Bassinet" In-line quotation, which relates to the '755 patent, is similarly structured. The process by which such In–Line quotations were generated was described at trial by Fisher–Price. Keeping in mind that we must consider the evidence in the light most favorable to Fisher–Price, we believe there is substantial evidence to support the jury's determination that the "In–Line" agreements between Fisher–Price and the Asian vendor did not rise to the level of commercial offers for sale.

For example, there was before the jury testimony to the effect that the initial In–Line document was only the beginning of a normally lengthy negotiation process, which would ultimately lead to the first purchase order for a commercial version of a new Fisher–Price product. Additionally, it appears that the *final* In–Line quotations for each of the accused products were, in fact, not approved until after the critical dates for each of the patents. Finally, as Fisher–Price notes, Safety 1st did not present any evidence from any of the Asian vendors who allegedly offered to sell the products at issue. There is, therefore, no evidence in the record that bears directly on whether the vendors intended or understood that they would be bound by their initial price quotations.[2]

C. *Whether the '755 patent satisfies the written description requirement*

■ We now turn to Safety 1st's contention that the '755 patent is invalid for failure to satisfy the written description requirement of 35 U.S.C. § 112, ¶ 1. Safety 1st essentially argues that an amendment to claim 1 made during prosecution took the claim outside the scope of what was contemplated in the original specification. Such an amendment would violate the statutory requirement that the specification "contain a written description of the invention, and of the manner and process of making and using it...." 35 U.S.C. § 112, ¶ 1 (2000).

The '755 patent is directed to a two-part harness restraint of a type to be used in a bassinet or bouncer. One element of original claim 1 recited "a second member being fixable to the rear face." Claim 1 was amended in both form and scope during prosecution. Importantly, the requirement that the harness be "fixable to the rear face" was eliminated. Specifically, claim 1 was amended to recite "a first harness portion fixedly secured to the seating portion of the child's seat, said first harness portion including a first fastener

---

**2.** Because we find sufficient evidence to support the jury's conclusion on this issue, we need not address Fisher–Price's alternative argument that the offer for sale was not technically made in the United States, as required by section 102(b).

disposed on the seating side of the seating portion." It is undisputed that Fisher–Price amended claim 1 to cover Safety 1st's product, in which the harness is not fixed to the rear face of the seat. Safety 1st asserts that the specification as filed does not support Fisher–Price's amendment—namely, a harness system that is not fixable to the rear face of the seat. For this reason, Safety 1st argues the '755 patent is invalid under § 112, ¶ 1, for having an inadequate written description.

The issue of compliance with the written description requirement is a question of fact. *Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 1158 (Fed.Cir.1998). The written description need not describe exactly the subject matter claimed, but the description must clearly allow persons of ordinary skill in the art to recognize that the inventor had possession of the claimed invention. *Vas–Cath, Inc. v. Mahurkar,* 935 F.2d 1555, 1563 (Fed.Cir.1991). Amended claims that introduce elements or limitations which are not supported by the as filed disclosure violate the written description requirement. *In re Lukash,* 58 C.C.P.A. 1233, 442 F.2d 967, 968 (1971); *Gentry Gallery, Inc. v. Berkline Corp.,* 134 F.3d 1473, 1478–80 (Fed.Cir.1998).

According to Safety 1st "[a]ttaching the harness to the *rear* face was an essential part of the harness invention." It asserts that the only embodiments described in the specification are so configured and that the application as filed "did not suggest or describe a harness that was *not* attached to the rear of the child support surface." Relying on our decision in *Gentry Gallery,* Safety 1st argues that the claims as issued are broader than the disclosure provided in the originally filed specification and contrary to the stated purpose of the invention.

For its part, Fisher–Price argues that Safety 1st critically analyzes the specifica-tion to divine the "stated purpose" or "essential feature" of the invention, and then criticizes the failure to include the alleged "essential feature" in the claim. Fisher–Price points to our decision in *Amgen, Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1333 (Fed.Cir.2003), where we stated that *Gentry Gallery* does not mandate "an inquiry into what an inventor considers to be essential to his invention and requir[e] that the claims incorporate those elements." According to Fisher–Price, we have limited *Gentry Gallery's* holding of invalidity "to the rare situation where the claim omits what the patent specification identifies as 'the only possible' configuration of the invention." *Cordis,* 339 F.3d at 1365. Fisher–Price contends that is not the case here and that nothing in the specification, or in Safety 1st's arguments, supports a contention that the "only possible" location of the securing member in the invention is on the rear face of the seat.

Safety 1st had the burden of proving by clear and convincing evidence that the written description requirement was not met. The district court noted that Safety 1st "called no expert or any other witness to testify as to whether the written description would 'enable any person skilled in the art ... to make and use' the invention. Indeed, the record reflects an absolute dearth of evidence on this topic until defendant's closing summation." *Fisher–Price,* 279 F.Supp.2d at 541. In view of the deferential standard of review given to questions of fact, and the district court's observations on the sufficiency of the evidence, we will not disturb the jury's finding that Safety 1st failed to establish that the '755 patent as issued does not meet the written description requirement of 35 U.S.C. § 112, ¶ 1.

### D. *Infringement of the D'940 patent*

We turn now to the infringement issues. Safety 1st contends that Fisher–

Price failed to prove infringement of the D'940 patent by the Bouncenette 1 product. As with utility patents, determining whether a design patent is infringed is a two-step process. *Catalina Lighting, Inc. v. Lamps Plus, Inc.,* 295 F.3d 1277, 1287 (Fed.Cir.2002). "First, the court must construe the design patent's claim. Next, the fact-finder must compare the claim and the accused device, employing both the 'ordinary observer' test and the 'point of novelty' test." *Id.* at 1286. According to the "point of novelty" test, the fact-finder must determine whether the accused design appropriates the points of novelty that distinguish the patented design from the prior art. *Id.* at 1286–87. Put differently, "even though the court compares two items through the eyes of the ordinary observer, it must nevertheless, to find infringement, attribute their similarity to the novelty which distinguishes the patented device from the prior art." *Litton Sys., Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1444 (Fed.Cir.1984). Design patent infringement is a question of fact for the jury, *Catalina Lighting,* 295 F.3d at 1287.

Safety 1st argues that the jury verdict was not supported by substantial evidence on the "point of novelty" prong of design patent infringement analysis. According to Safety 1st, the point-of-novelty was that which should have distinguished the D'940 patent from the prior art Zeigler prototype model. It asserts that "Fisher–Price introduced *no* evidence concerning what, if any, point of novelty the '940 patent had over the prior art Zeigler model, and, consequently, made no effort to prove that the point of novelty was appropriated by the Bouncenette 1." Fisher–Price responds that the jury "was presented with ample testimony and physical evidence about the novelty of the D'940 patented design in view of the Ziegler design."

We find Safety 1st's argument compelling. Fisher–Price does not point to any testimony wherein it identified the "point of novelty" that distinguished the patented D'940 design over the Zeigler prior art model. Indeed, during the trial, Fisher–Price attempted to cast doubt as to whether Zeigler was even prior art, a position that Fisher–Price does not take on appeal. We believe that Fisher–Price failed, as a matter of law, to meets its burden of proving the "point of novelty" prong of design patent infringement. The district court erred in not granting Safety 1st's motion for JMOL. We therefore reverse the jury's finding of infringement of the D'940 patent and remand with instructions to enter JMOL of non-infringement with respect to the D'940 patent.

There are four arguments made by Safety 1st on direct appeal that are now moot in light of our holding of non-infringement of the D'940 patent. First, Safety 1st argued that the district court committed reversible error when it refused to instruct the jury that the Zeigler prototype was prior art. Second, Safety 1st argued that Fisher–Price cannot recover damages under the D'940 patent for sales of the non-infringing Bouncenette 2 in boxes depicting the allegedly infringing Bouncenette 1 design. Third, Safety 1st contends that the district court erred when it denied its motion to amend its complaint to plead inequitable conduct with respect to the D'940 patent. Finally, Safety 1st argues that it is entitled to a limitation on damages awarded for infringement of the D'940 patent because of Fisher–Price's alleged failure to comply with the patent marking requirements of 35 U.S.C. § 287(a). Because we reverse the finding of infringement with respect to the D'940 patent, we need not address these issues.

### E. *Infringement of the '552 patent*

The jury found that the accused Bouncenette and Magic Motion products in-

fringed claim 36 of the '552 patent. Safety 1st raises two arguments as to why it was entitled to JMOL of non-infringement. First, it argues that the accused products do not meet the claim 36 limitation that reads "and a *pair of receptable [sic] support strap* straps [are] attached to the receptacle and *are interconnected* to support the first end at the angle ...." '552 patent, col. 14, ll. 43–46. Second, it argues that the accused products do not meet the claim 36 limitation requiring "a collapsible support frame *movably connected* to the suspension assembly." *Id.* col. 14, ll. 28–30 We discuss each limitation in turn.

### i. Pair of interconnected receptacle support straps

■  Claim 36 of the '552 patent recites as one of its limitations a *"pair of receptable [sic] support strap* straps [that] *are interconnected."* *Id.* col. 14, ll. 44–46. In its *Markman Order*, the district court construed the phrase to mean that "the straps may be connected at any position on the receptacle as long as when the straps are connected, the first end of the support surface is at an angle with respect to the second end of the support surface. The first end of the support surface is not required to rest against the straps at an angle with respect to the second end of the support surface." *Markman Order*, 2002 WL 500572, *20, 2002 U.S. Dist. LEXIS at *6–7. On this construction, the jury found that the Bouncenette and Magic Motion products use the same mechanism to adjust the angle of the infant-supporting receptacle, and therefore infringe.

Safety 1st's argument with respect to the interconnected support straps limitation rests entirely on its contention that Fisher–Price disclaimed the two strap configuration used in the accused product when it amended claim 36 during prosecution in view of the prior art Bigo patent, United Kingdom Patent Application GB2163045A ("Bigo"). Safety 1st thus rests its argument on the doctrine of prosecution history estoppel, asserting that "[t]he district court failed to acknowledge that the construction of that limitation is controlled by the prosecution history."

In support of its prosecution history estoppel argument, Safety 1st contends that "the text of Bigo ... disclosed other embodiments, including the one used by Safety 1st, where there is a pair of buckled straps on either side." Therefore, argues Safety 1st, the amendment to claim 36, which was made in light of Bigo, *"must thus be construed to exclude an infant-supporting device with two pairs of 'buckled straps'* where, as was described in Bigo, one pair suspends the left side of the angled support surface and the other pair suspends the right side."

The problem with this argument, as Fisher–Price notes, is that Bigo makes only a passing reference to "self gripping or buckled or knotted straps." Bigo, p. 1, ll. 92–98. The Bigo reference does not, in its text or drawings, describe how such "buckled or knotted" straps would be configured. While a reference is useful as prior art for all that it discloses, it cannot be read to disclose what is not apparent to one skilled in the art. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1052 (Fed.Cir.1994) ("[A] challenger must prove that [a characteristic] is necessarily present in the [prior art] disclosure, and that it would be so recognized by persons of ordinary skill."). After reviewing the Bigo reference, we believe that Safety 1st reads far too much into Bigo when it asserts Bigo "discloses [an embodiment where] one pair suspends the left side of the angled support surface and the other pair suspends the right side." In short, we do not find compelling Safety's

1st's prosecution history estoppel argument. As a final matter, Fisher–Price notes that Safety 1st presented no testimony from any witness that Bigo disclosed interconnected straps, either expressly or inherently; it offered only attorney argument. *Fisher–Price*, 279 F.Supp.2d at 539.

■ The district court did not err in its construction of the "pair of receptable [sic] support strap straps [that] are interconnected" limitation. In addition, substantial evidence supports the jury's factual finding that the Bouncenette 1 and 2 products meet this claim limitation.

### ii. *Movably connected*

■ Claim 36 of the '552 patent also recites as one of its limitations "a collapsible support frame *movably connected* to the suspension frame assembly." '552 patent, col 14, ll. 28–29 In the *Markman Order*, the district court construed the "movably connected" limitation to mean "that the support frame is movably connected to the suspension assembly, but there is no requirement that the support frame move with respect to each part of the suspension assembly." *Markman Order*, 2002 WL 500572, * 9, 2002 U.S. Dist. LEXIS at *6. On this construction, the jury found that all three versions of the Bouncenette products contain a support frame and suspension assembly that meets this limitation.

Safety 1st's argument with respect to the "movably connected" limitation of claim 36 is that it would be counter to the ordinary meaning of the chosen claim language if the "suspension assembly" and "support frame" were permitted to have in common a major structural component, namely, one of the legs. In support, Safety 1st cites to *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1105 (Fed.Cir.1996), where we refused to construe a claim that separately recited a "shoe upper" and a "tab" that extended along the shoe upper in a manner that would have allowed the "tab" to include a portion of the "shoe upper." In similar fashion, Safety 1st asserts that "[i]f one component is said to be 'movably connected' to another, and if 'movably connected' is given its ordinary meaning, it would seem that the two components would have to be separate."

The problem with this argument, as Fisher–Price notes, is that nothing in the plain meaning of the phrase " 'movably connected' [inherently] eliminates the possibility of common portions shared between the members so connected." In fact, Fisher–Price compellingly argues that such a construction would read out a preferred embodiment of the invention. Finally, the district court noted that Fisher–Price put forth expert testimony to support its infringement theory. *Fisher–Price*, 279 F.Supp.2d at 541. The expert used demonstrative exhibits and models of the accused products to support his testimony. *Id.* On the other hand, Safety 1st "adduced no expert opinion to the contrary, but merely argued though counsel that the accused products did not meet the 'movably connected' limitation." *Id.* As the district court noted, "[t]he jury rejected [Safety 1st's] argument, as it was entitled to do." *Id.*

■ Because the district court did not err in its construction of the "movably connected" limitation, and because there is substantial evidence to support the jury's factual finding that the Bouncenette products meet this claim limitation, we will not disturb the jury's infringement determination.

### E. *Damages*

Until just before its complaint was filed, Fisher–Price did not own the '552 or D'940

patents. Mattel owned the patents. Mattel assigned the patents to Fisher–Price on January 23, 2001, three days before Fisher–Price filed suit. As part of the assignment, Mattel assigned to Fisher–Price the right to sue for Mattel's damages.

Safety 1st argues that, with respect to infringement of the '552 and D'940 patents, Fisher–Price cannot recover the remedy of "lost profits" for the period prior to January 23, 2001 because during that period the '552 and D'940 patents were not owned by Fisher–Price, but rather by Mattel. Safety 1st contends that it did not directly compete with Mattel and that Mattel, therefore, had no right to any lost profits. *See Bott v. Four Star Corp.*, 807 F.2d 1567, 1570–71 (Fed.Cir.1986) (no lost profits in sales where patent owner did not compete). Lost profits are only available if a patent owner could have made the sales the alleged infringer made, but for the infringement. *Id.*, at 1570; *Bio–Rad Labs., Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 616 (Fed.Cir.1984). If a patent owner does not compete with the accused infringer, no such sales could have been made, and lost profits are not available.

For its part, Fisher–Price notes that it is a wholly owned subsidiary of Mattel—a fact explicitly recognized by Safety 1st's own witnesses. In fact, Safety 1st's witnesses testified that "anything Fisher–Price sells, technically, Mattel sells." It thus appears that Safety 1st considered itself to be in direct competition with the Mattel/Fisher–Price family. For these reasons, we find Safety 1st's contention that it does not compete directly with Fisher–Price to be unpersuasive. We thus do not disturb the district court's ruling on this issue.

## IV.

We now turn to Fisher–Price's cross-appeal. Fisher–Price contends that the district court made what appears to be an inadvertent mistake when it ordered a new trial on damages, but excluded evidence of damages as to the Bouncenette 3 product. *Fisher–Price*, 279 F.Supp.2d at 550. We review a district courts exclusion of evidence under the abuse of discretion standard. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1216 (Fed.Cir. 2002). An abuse of discretion may be shown where the district court has made a clear error of judgment. *Ranbaxy Pharmaceuticals, Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1239 (Fed.Cir.2003).

As Fisher–Price correctly notes, the jury found that Bouncenette 3 did, in fact, infringe the '755 patent. Safety 1st did not challenge the jury's finding of infringement for the '755 patent, nor does Safety 1st dispute that the district court inadvertently excluded evidence of damages for Bouncenette 3 when it ordered a new trial for damages. For these reasons, we believe the district court made a clear error of judgment and we remand with instructions that the district court consider evidence of damages related to sales of the infringing Bouncenette 3.

## V.

In sum,

(1) We affirm the judgment that the '755 and D'940 patents are not invalid under the on-sale bar of 35 U.S.C. § 102(b).

(2) We affirm the judgment that the '755 patent is not invalid by reason of an inadequate written description.

(3) We reverse the judgment of infringement with respect to the D'940 patent.

(4) We affirm the judgment of infringement with respect to the '552 patent.

(5) We affirm the entry of the permanent injunction.

(6) We modify the district court's order relating to damages with respect to the '552 and '755 patents insofar as it bars consideration of damages relating to sales of Bouncenette 3.